# TRAVERS *v.* REINHARDT.

APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 76.  Argued November 1, 2, 1906.—Decided April 15, 1907.

While the predominant idea of the testator's mind when discovered is to be heeded as against all doubtful and conflicting provisions which might defeat it, effect must be given to all the words of a will if by the rules of law it can be done; and the words "without leaving a wife *or* child or children" will not be construed as "without leaving a wife *and* child or children," notwithstanding a general dominant interest on the part of the testator that his real estate should descend only through his sons.

A man and woman, neither of whom was a resident of Virginia, and who had not obtained any marriage license, went through a ceremony in Virginia which the woman thought was a marriage by a clergyman; they immediately went to New Jersey, she assuming the man's name; they afterwards went to Maryland and then returned to New Jersey permanently, where they lived and cohabitated as husband and wife and were so regarded for many years until his death, she joining in a mortgage with him, and also being described in his wills as his wife; she meanwhile and, prior to the later residence in New Jersey, had ascertained that the person performing the ceremony was not a minister and that there was no license, but the cohabitation continued and there was testimony that the man assured her that they were married, and afterwards in his last will he appointed his wife executrix and she qualified as such; *Held,* that:

Marriage in fact, as distinguished from a ceremonial marriage, may be proved by habit and repute, and, except in cases of adultery and bigamy when actual proof is required, may be inferred from continued cohabita-

tion and reputation; and even- though in view of the statutory require-
ments in those States the marriage might have been invalid in Virginia
for want of license, and in Maryland for want of religious ceremony, the
cohabitation in good faith and reputation during their residence in
New Jersey, and their conduct towards each other from the time of the
ceremony until the man's death, established an agreement between the
parties' *per verba de præsenti*·to become husband and wife which was as
effective to establish that status in New Jersey as if made in words of
the present tense after the parties had become domiciled in that State.
25 App. D. C. 567, affirmed.

The facts are stated in the opinion. ·

Mr. *Bernard Carter* and Mr. *Arthur A. Birney,* with whom
Mr. *Charles H. Stanley,* Mr. *Edward A. Newman* and Mr. *Fillmore Beall* were on the brief, for appellants:

The testator devised all his real estate, except a small portion
thereof, to his four sons. By a codicil he revoked the devise
to his daughter Elizabeth and gave that parcel to one of his
sons.

In making the devises to his son Elias and a portion to his
son Joseph, he made them to such son, "his heirs and assigns
forever in fee simple." The other devises are to his several
sons, "their heirs and assigns forever," without the addition
of the words "in fee simple." · No devises are in terms of a
less estate. That the testator deliberately made the distinction
in the terms of these two classes of devises is shown by the
"general provision," of the will, to the effect of which he
subjects each of the devises of the second class.

The language of the devises was, without more, ample to
create a fee simple. Qualified by the general provision, each
of the devises affected thereby became a determinable fee in
the first taker, with an executory devise over to the surviving
sons and the child or children of such as might be dead. *Abbott* v. *Essex Company,* 18 How. 202; *Richardson* v. *Noyes,*
2 Massachusetts, 56; Underhill on Wills, 1272, 1274.

It is a rule in construing wills that where a general intent is
apparent upon the face of the will, and a particular intent
is also expressed which conflicts with such general intent, the

latter will prevail. 2 Williams on Executors (7th Am. ed.), 333; *Chase* v. *Lockerman*, 11 G. & J. 286; *Thompson* v. *Young*, 25 Maryland, 459; *Taylor* v. *Watson*, 35 Maryland, 524; *Smith* v. *Bell*, 6 Pet. 68; *In re Banks' Will*, 87 Maryland, 425.

The construction of the will is to be made from the entire instrument, including the codicil, and the intent of the testator thus ascertained be permitted to govern. *Jones* v. *Wright*, 2 Bligh, 49; *White* v. *Crenshaw*, 5 Mackey, 115.

Where two clauses in a will operate on the same property, devising it differently, giving it to different devisees, or showing a different technical intention, the latter clause will prevail. *Dugan* v. *Hollins*, 13 Maryland, 149; *Manning* v. *Thurston*, 59 Maryland, 226.

The general intent of the testator being to keep his real estate within the male line of descent, to the exclusion of, the female, is it to be supposed that he was willing that this intent should be defeated by the mere marriage of a son? He might be willing to measurably provide for a widow, through an allowance equal to dower, but the existence of the widow affords no reason for letting in the daughters to heir.

Courts will change or mold language so as to give effect to the intention. Schouler on Wills, 3d ed., § 477; Jarman on Wills, 505, 507; *Doe* v. *Watson*, 8 How. 263, 272; *Hance* v. *Noble*, 172 U. S. 383, 389; *Hardenbergh* v. *Ray*, 151 U. S. 126; *Shugloff* v. *Johns*, 87 Maryland, 273; *Scarlett* v. *Montell*, 95 Maryland, 157.

The words "wife or child or children" should be read wife *and* child or children. The cases cited and many others justify such change.

If the will be construed as we contend, the proceeds of the devises to James, affected by the general provision, must be awarded to the appellants, for it will not be claimed that he left a child surviving him; if, however, this point be ruled against the appellants, they must yet succeed, unless it has been shown, either, first, that James Travers married and his wife survived him; or, second, that he and his brother Elias

(the last survivor of the brothers) entered into a binding agreement with their sisters that they should share as heirs in the property thus devised to James. No such marriage was proved, and the alleged agreement or estoppel was not established.

The testimony of the woman, Sophia V. O'Brien, should have been rejected as wholly unworthy of belief, and with this out of the case there would not have been the slightest evidence that James Travers was ever married, except the recitals of his mutilated will of 1881, of his will of 1883, and of the mortgage deed of September 27, 1867.

The mortgage, and the will of 1881, were both made in Maryland, where the "common law marriage," so called, is unknown, and a ceremony *in facie ecclesiæ* is necessary to a valid union. *Denison* v. *Denison*, 35 Maryland, 297.

The will of 1883 seems to have been made in New Jersey, where a looser rule prevails, but where a contract to marry is as important as it is in Maryland.

The Court of Appeals had no basis in the evidence for the assertion in its opinion that during the whole time he called her and introduced her as his wife, and she was so recognized in the community generally.

The only witness sworn was the woman. She certainly could not establish her own repute as married. She said nothing whatever of her life at Point Pleasant, before the death of Travers, and, of her life elsewhere, said only that Travers introduced her as his wife, and that she was called "Mrs. Travers." This falls far short of proving that "public recognition," which this court has declared "necessary as evidence of its existence," in the case of the marriage without ceremony or record. *Maryland* v. *Baldwin*, 112 U. S. 490, 495; *Commonwealth* v. *Stump*, 53 Pa. St. 132 (cited 112 U. S. 495); *Jones* v. *Hunter*, 2 La. Ann. 224; *Taylor* v. *Swett*, 22 Am. Dec. 159, note. This case, then, must turn upon the question whether there was a valid marriage between James Travers and Sophia Grayson at Alexandria, Virginia, on August 15, 1865.

The Virginia statute required that in all cases a license should issue and without it there could be no valid marriage. The emphatic decision of the Court of Appeals of Virginia, delivered in 1901, would foreclose discussion on this subject were it not for the ground taken by Mr. Justice Gould, in sustaining as a marriage the union under discussion. *Offield* v. *Davis*, 100 Virginia, 250; *Beverlin* v. *Beverlin*, 29 W. Va. 732.

The Virginia decision is conclusive that without a license there could be no marriage in that State. *Leffingwell* v. *Warren*, 2 Black, 599, 603; *Green* v. *Lessee of Neal*, 6 Pet. 291; *Bauserman* v. *Blunt*, 147 U. S. 652; *Meister* v. *Moore*, 96 U. S. 82; *Fairfield* v. *County of Gallatin*, 100 U. S. 47, 52.

*Mr. William A. Gordon, Mr. George E. Hamilton* and *Mr. M. J. Colbert*, with whom *Mr. J. Holdsworth Gordon* was on the brief, for appellees:

While the marriage in Virginia in 1865 did not comply with the statute of that State, under *Offield* v. *Davis*, 100 Virginia, 250, and would have been void as to the status of the parties in that State and as to property there located, as the parties immediately left that State and never returned there, but subsequently resided in New Jersey and Maryland, and as the property in controversy is located in the District of Columbia, the status of Sophia as the wife of James Travers at the time of his decease does not depend upon the law in Virginia.

It has never been held that the law in the District of Columbia denied validity to marriages good at common law, and in fact the only *dicta* on the subject lean toward the validity of such marriages, even when contracted in said District. *Thomas* v. *Holtzman*, 18 App. D. C. 66.

The fact that letters testamentary were granted to her by the New Jersey court as the widow of James Travers, although her name was not given in the will, is conclusive proof of the reputation of marriage in that community; and the fact that his next of kin and heirs-at-law permitted her as "wife"

to qualify as executrix and take under the devise to his "wife" shows conclusively that she was recognized by them as the wife of their brother.

The bequest in the will of his sister Elizabeth, a nun in the convent at Georgetown, to Annie E. Travers, the reputed child of James, as her "niece" should be received as evidence of reputation, so far as that sister is concerned, as to the marriage, and that James and Sophia V. Travers were man and wife.

These acts certainly constituted a marriage under the laws of New Jersey, and if a lawful marriage in that State it will be recognized as such in the District of Columbia.

*Atlantic City R. R. Co.* v. *Gooding,* 62 N. J. 394, it was held that a contract of marriage made *per verba de præsenti* constitutes an actual marriage and is valid, and in *Stevens* v. *Stevens,* 56 N. J. Eq. 490, that a common law marriage is good. Even though the marriage in Virginia did not constitute a lawful marriage in that State, it did constitute an agreement between the parties to accept each other as man and wife, thus constituting a marriage good at common law, and their stay in New Jersey immediately after said common law marriage, and especially the residence in that State in 1883, prior to the death of James Travers, and their living there in compliance with the terms of the contract entered into in Virginia, made their status that of man and wife. *Meister* v. *Moore,* 96 U. S. 76; *Meyer* v. *Pope,* 110 Massachusetts, 314; *Smith* v. *Smith,* 52 N. J. 207.

The decision in *Offield* v. *Davis,* rendered in 1902, is not conclusive on this court, as in 1877 it decided, in *Meister* v. *Moore, supra,* in construing a statute in many respects identical with the Virginia statute, that a marriage similar to that now under consideration was valid.

MR. JUSTICE HARLAN delivered the opinion of the court.

This suit was originally brought for the partition or sale of

certain real estate in the city of Washington devised by the will (and codicils thereto) of Nicholas Travers who died in the year 1849, leaving four sons and three daughters.

The only parts of that estate remaining in dispute are certain lots in square 291 in Washington, and the questions to be determined depend upon the construction of that will and upon the evidence touching the alleged marriage of James Travers, a son of the testator, with Sophia V. Grayson.

By the first item of the will certain lots are devised to the testator's son Elias "and his heirs and assigns forever in fee simple." By the same item other lots are devised to the same son, "which last two devises shall be subject to the general provision hereinafter made in case of any sons dying without leaving a wife or child or children."

By the second item the testator devised lot 5, in square 291, to his son "Joseph Travers and his heirs forever," and two other specified lots "to him and his heirs forever, in fee simple;" lot 5 "being subject to the general provision aforesaid hereafter made."

By the third item he devised to his son Nicholas and his heirs forever certain lots in square 291 "subject to the general provision hereinafter made;" also "to him and his heirs forever, in fee simple," other real estate in square 36, and a designated parcel of ground in square 291, "said piece or parcel of ground to be subject to the general provision hereafter made."

By the fourth item certain devises are made to the son "James Travers and his heirs forever," "all of which devises are to be subject to the general provision hereinafter made."

Here follows, at the close of the fourth item, the "general provision" referred to: "With regard to the several estates hereinbefore devised to my several sons, it is hereby declared to be my will, and I do order and direct, as a general provision, that if any of my sons should die *without leaving a wife, or a child or children living at his death*, then his estate herein devised to him, saving and excepting those portions thereof expressly granted and so named to be 'in fee simple,' and which they

can sell and dispose of as they think fit, shall go, and be invested in fee, to my surviving sons and the child or children of such as may be dead, such child or children representing the share of the father—but if either of my sons shall, at his death, leave a wife either with or without a child or children, such wife shall be entitled to her dower rights and privileges."

This was followed in the will by certain devises for the benefit of the daughters, as well as by several codicils to the will, but it is not necessary to give their provisions in detail.

By a codicil, dated June 26th, 1848, the testator revoked certain parts of his will, providing: "And in lieu thereof I do hereby give and devise all of said lots or part of lots, so as aforesaid described, with the house and other improvements and appurtenances, to my son James and his heirs, subject to the express stipulations and restrictions contained in the will to which this is a codicil, wherein I declare that all and every portion of my real estate not devised by the use of the words 'in fee simple,' shall be held by such devisees for life, and then according to stipulations and restrictions as therein contained and declared by said will."

It is contended here, as it was in the courts below, that the words in the above general provision, that "if any of my sons should die without leaving a wife or child or children living at his death," should be interpreted as if it read "if any of my sons should die without leaving a wife *and* child or children living at his death." The court is thus asked, by interpretation, to substitute the word "and" in place of "or" in the above sentence.

Looking at all the provisions of the will, and ascertaining, as best we may, the intention of the testator, we perceive no reason for interpreting the words used by him otherwise than according to their ordinary, natural meaning.

It is insisted by appellants that the general, dominant purpose of the testator was that his real estate should descend only through his sons, and that his daughters and their descendants should have no share therein. And the doctrine is in-

voked that "the predominant idea of a testator's mind, when discovered, is to be heeded as against all doubtful and conflicting provisions which might of themselves defeat it; and the general intent and particular intent being inconsistent, the latter (the particular) must be sacrificed to the former—the general intent." Schouler on Wills, § 476. This general doctrine is not controverted, but there are other cardinal rules in the interpretation of wills which must be regarded. Mr. Justice Story, speaking for this court, said that effect must be given "to all the words of a will, if, by the rules of law, it can be done. And where words occur in a will their plain and ordinary sense is to be attached to them, unless the testator manifestly applies them in some other sense." *Wright* v. *Denn*, 10 Wheat. 204, 239. "The first and great rule in the exposition of wills," said Chief Justice Marshall, "to which all other rules must bend, is that the intention of the testator expressed in his will shall prevail, provided it be consistent with the rules of law." *Smith* v. *Bell*, 6 Pet. 68, 75; *Finlay* v. *King*, 3 Pet. 346, 377. The same thought, in substance, was expressed by Lord Chancellor Eldon in *Crooke* v. *De Vendes*, 9 Ves. 197, 205. He said that "where words have once got a clear, settled, legal meaning, it is very dangerous to conjecture against that, upon no better foundation than simply that it is improbable, the testator could have meant to do one thing by one set of words, having done another thing, using other words, as to persons in the same degree of relation to him." It would seem clear that the words "without leaving a wife or child or children," where they first appear in the above general provision, were purposely chosen. They appear three times in the will, and their usual meaning is not doubtful. We think the testator meant "or," not "and." The court would not be justified in making the proposed substitution unless the whole context of the will plainly and beyond question requires that to be done in order to give effect to the will of the testator. That the words, in the general provision, "without leaving a wife or a child or children," were deliberately selected is to

some extent shown by the last sentence in the first item of the will, "which two devises shall be subject to the general provision hereinafter made in case of any sons dying without leaving a wife *or* child or children." We do not think that the testator used the word "or," intending thereby to convey the same thought as would be expressed by "and." We concur with the Court of Appeals, speaking by Chief Justice Shepard, in holding that the words in question are unambiguous, and their obvious, ordinary meaning must not be defeated by conjecture. 25 App. D. C. 567, 576.

The important question remains whether James Travers, the son of the testator, died leaving a wife or a child or children. If he did, then the decree below must be affirmed.

The original bill averred that James Travers died in 1883 "without widow or lawful child or children or descendants of a child or children surviving him." This averment was not specifically denied in the answers, but in the progress of the cause the defendants, children of the sisters of James Travers, amended their answer and alleged that he left surviving him "his widow, Sophia V. Travers, now Sophia V. O'Brien, who was his lawful wife at the time of his death and who had been his lawful wife for many years prior thereto, and he left one child, Annie E. Travers, one of the defendants herein, who was his lawful child." The issue thus made constituted the principal matter to which the proof was directed. Both of the courts below held that under the evidence Sophia V. was to be deemed the lawful wife of James Travers at the time of his death. Children were born to them, but they died very young. It is conceded that they left no child surviving them, Annie E. Travers being only an adopted child.

The appellants insisted throughout the case and now insist that the relation between James Travers and Sophia V. was not at any time one of a matrimonial cohabitation, but an illicit or meretricious cohabitation, which did not create the relation of husband and wife.

· Upon a careful scrutiny of all the evidence as to the alleged

marriage we think that the following facts may be regarded as established:

1. James Travers, whose domicil was in the District of Columbia, and Sophia V. Grayson, whose domicil was in West Virginia, were in Alexandria together on the fifteenth of August, 1865, when some sort of marriage ceremony (exactly what does not appear) was performed by a friend of Travers, whom the woman, then only about seventeen years of age, and without living parents, supposed at the time was a minister, entitled to officiate in that capacity at a marriage. She thought it was a real marriage by a minister, although he did not produce or have any license to solemnize the marriage of these parties. It must be taken upon the evidence that he was not a minister. By the statutes of Virginia then in force it was provided: "Every marriage in this State shall be under a license and solemnized in the manner herein provided, but no marriage solemnized by any persons professing to be authorized to solemnize the same shall be deemed or adjudged to be void, nor shall the validity thereof be in any way affected on account of any want of authority in such persons if the marriage be in all other respects lawful and be consummated with a full belief on the part of the persons so married, or either of them, that they have been lawfully joined in marriage."

2. Immediately after the affair at Alexandria the parties— the woman, from and after that occasion, assuming the name of Mrs. Travers—left Virginia and went to Shrewsbury, New Jersey, where, as husband and wife, they remained for a short time, after which they went to Belair, Harford County, Maryland, living there, as husband and wife, at a rented place.

3. In 1867 Travers purchased a farm in Talbot County, Maryland, on which he lived with said Sophia until some time in 1883, when that farm was sold, and, on account of Travers' health, they removed to Point Pleasant, New Jersey, and purchased property there, having lived on the Talbot County farm, as husband and wife, for more than fifteen years. Travers died at Point Pleasant in the latter part of the year 1883, and

five years after his death the woman, claiming to be and recognized in the community as the widow of James Travers. married a lawyer of Philadelphia, the ceremony being performed at the Catholic Church in Point Pleasant.

4. From the fifteenth of August, 1865, up to his death, on the first day of November, 1883—a period of more than eighteen years—Travers and Mrs. Travers continuously cohabited *as husband and wife.* During all that period they acted as if they were lawfully husband and wife, and uniformly held themselves out as sustaining that relation; and beyond all question they were regarded as husband and wife in the several communities in which they lived after leaving Alexandria in 1865. There is no proof that any one coming in contact with them regarded them otherwise.

5. About five or six years after the latter date Mrs. Travers learned, for the first time, that Travers' "friend" who had officiated at the ceremony in Alexandria was not a minister. She was asked, when giving her deposition, this question: "Q. After you discovered, some four or five years after you went to live with Mr. Travers, that you had not been married to him according to any ceremony, did he ever make any promise to you in that regard? A. Always. Poor fellow, he would have it all right—— Mr. Birney: We object to that. Q. And what did he say? A. Well, he would always say that it was all right, and we were just as much married as if we had been married before a priest or a minister." Upon the basis of their being husband and wife the parties continuously rested their relations to each other up to the death of Travers.

6. That Travers recognized Mrs. Travers as his wife, and held her out as such, appears from many facts: (a) In a mortgage executed September 27th, 1867, to secure the balance of the purchase money due on the Talbot County farm, the mortgagors are described, both in the body of the mortgage as "James Travers and Sophia V. Travers, his wife, of Harford County, in the State of Maryland," and in the certificate of acknowledgment as "James Travers and Sophia V. Travers,

his wife," and she signed and acknowledged the mortgage as
Sophia V. Travers. (*b*) By a mutilated, holographic will dated
February 8th, 1881, and signed by James Travers, he gave,
devised and bequeathed "to my wife Sophy Virginia Travers,"
all his household furniture, books, pictures, etc., to have and
to hold the same to her, and her executors, administrators and
assigns forever; also, to her the use, improvement and income
of his dwelling house and farm, "to have and to hold the same
to her for and during her natural life; and from and after the
decease of my said wife, I give and bequeath," etc.; and by
which, further, he gave, devised and bequeathed "to my wife
Sophy Virginia Travers, for her sole use," all the rest and
residue of the testator's estate, real, personal or mixed, of
which he died seized and possessed, or to which he should be
entitled at the time of his decease. That will concluded:
"Lastly, I do nominate and appoint my said wife sole executrix
of this my last will and testament." (*c*) By a will dated at
Point Pleasant, New Jersey, October 5th, 1883, witnessed by
three persons, James Travers devised to his brothers and sisters
all his interest and property in the District of Columbia, and
"to my wife, while she remains *my widow*, all my property of
every description and character not hereinbefore disposed of
with full power of disposition and alienation, provided, how-
ever, that in case our daughter survives her, that all the
property not disposed of prior to *my wife's* decease shall be and
become the property of our said daughter, and in the event
of *my wife's* contracting *another* marriage, then, it is my will
that she shall possess and enjoy as of her own right, only one-
third of the property then remaining, and that the other two-
thirds shall be invested and held in trust for my daughter
Annie, and paid to her upon attaining her majority. . . .
I hereby appoint *my wife* Sole Executrix of this my last will
and testament." That will was duly proven before the Surro-
gate of Ocean County, New Jersey, partly by Mrs. Travers,
and that officer certified that "Sophia Virginia Travers of the
county of Ocean, the executrix therein named, proved the

same before me and she is duly authorized to take upon herself the administration of the estate of the testator agreeably to said will." That will was duly filed and recorded in the proper office in the District of Columbia.

In view of these facts, the question is whether the woman Sophia was to be deemed the lawful wife of James Travers at the time of his death in 1883. Marriage in fact, as distinguished from a ceremonial marriage, may be proven in various ways. Of course the best evidence of the exchange of marriage consent between the parties would come from those who were personally present when they mutually agreed to take each other as husband and wife, and to assume all the responsibilities of that relation. But a legal marriage may be established in other ways. It may be shown by what is called habit or repute. Referring to marriage at common law, Kent says: "The consent of the parties may be declared before a magistrate, or simply before witnesses, or subsequently confessed or acknowledged, or the marriage may even be inferred from continual cohabitation and reputation as husband and wife, except in cases of civil actions for adultery, or in public prosecutions for bigamy or adultery, when actual proof of the marriage is required." 2 Kent, 12th ed., 88.

Naturally, the first inquiry must have reference to what occurred at Alexandria, Virginia, in 1865, when, as the woman supposed—in good faith, we think—that there was a real, valid marriage between her and James Travers. But we will assume for the purposes of this case only that that marriage was not a valid one under the laws of Virginia. We do this in deference to the decision of the Supreme Court of Appeals of Virginia in *Offield* v. *Davis*, 100 Virginia, 250, 263, in which that court, construing the above statute of that Commonwealth, held it to be mandatory, not directory, and had abrogated the common law in force in Virginia, and that no marriage or attempted marriage, if it took place there, would be held valid there, unless it be shown to have been under a license, and solemnized according to the statute of that Commonwealth. We will also

assume, but only for the purposes of the present decision, and because of the earnest contentions of the plaintiffs in error, that cohabitation in Maryland, as husband and wife, for more than fifteen years, and the recognition of that relation in the communities where they resided in that State, did not entitle James Travers and the woman Sophia to be regarded in that State as lawfully husband and wife. We make this assump-tion also because it appears here that James Travers and Sophia V. Grayson did not become husband and wife in virtue of any religious ceremony, and because it has been decided by the Court of Appeals of Maryland that in that State "there cannot be a valid marriage without a religious ceremony," although "a marriage may be competently proved without the testimony of witnesses who were present at the ceremony." *Richardson* v. *Smith*, 80 Maryland, 89, 93. That court also said in the same case: "The law has wisely provided that marriage may be proved by general reputation, cohabitation and ac-knowledgment; when these exist, it will be inferred that a religious ceremony has taken place; and this proof will not be invalidated because evidence cannot be obtained of the time, place and manner of the celebration of the marriage. On this point we think it unnecessary to do more than quote from *Redgrave* v. *Redgrave*, 38 Maryland, 93, 97: 'Where parties live together ostensibly as man and wife, demeaning themselves towards each other as such, and are received into society and treated by their friends and relations as having and being en-titled to that status, the law will, in favor of morality and decency, presume that they have been legally married. 1 Taylor, Evidence, §§ 140, 517; *Hervey* v. *Hervey*, 2 W. Bl. 877; *Goodman* v. *Goodman*, 28 L. J. Ch. 1; *Jewell* v. *Jewell*, 1 How. 219, 232. Indeed, the most usual way of proving mar-riage, except in actions for criminal conversation and in prosecu-tions for bigamy, is by general reputation, cohabitation and acknowledgment. *Sellman* v. *Bowen*, 8 Gill & John. 50; *Boone* v. *Purnell*, 28 Maryland, 607.' " We may refer, in this con-nection, to what the Supreme Court of the District of Columbia,

speaking by Judge Merrick, who was learned in the law of Maryland, said in *Thomas* v. *Holtzman*, 18 D. C. 62, 66: "In the first place, it is not at all apparent that it ever was the law that a marriage *in facie de ecclesiæ* was necessary for the purpose of legitimating the issue. It is true that the Court of Appeals of Maryland in the last four or five years has decided that such was the law, but that decision is not binding upon us. It is laid down by Blackstone that a marriage *per verba de præsenti* without the intervention of a clergyman is a legitimate marriage. And both Story and Kent say that according to the universal understanding in this country a marriage *per verba de præsenti*, without the intervention of a clergyman, followed by cohabitation, makes a legitimate marriage."

In *Voorhees* v. *Voorhees*, 1 Dick. Ch. 411, 413, 414, the Court of Chancery of New Jersey said: "Two essentials of a valid marriage are capacity and consent. . . . Marriage is a civil contract, and no ceremonial is indispensably requisite to its creation. A contract of marriage made *per verba de præsenti* amounts to an actual marriage and is valid," quoting *O'Gara* v. *Eisenlohr*, 38 N. Y. 296. In *Atlantic City* v. *Gordin*, 62 N. J. 394, 400, the New Jersey Court of Errors and Appeals said: "In the *Voorhees case* Vice Chancellor Van Fleet concedes that a contract of marriage made *per verba de præsenti* amounts to an actual marriage and is valid, and in the case of *Stevens* v. *Stevens*, 11 Dick. Ch. Rep. 488, Vice Chancellor Pitney declares the law on the subject to the same effect, citing abundant authority."

This brings us to consider what were the relations of these parties after selling the Maryland farm and after taking up their residence in New Jersey in 1883. That their cohabitation, as husband and wife, after 1865 and while they lived in Maryland, continued without change after they became domiciled in New Jersey and up to the death of James Travers; and that they held themselves out in New Jersey as lawfully husband and wife, and recognized themselves and were recognized in the community as sustaining that relation, is manifest from

all the evidence and circumstances. It is impossible to explain their conduct towards each other while living in New Jersey upon any other theory than that they regarded each other as legally holding the matrimonial relation of husband and wife. It is true that no witness proves express words signifying an actual agreement or contract between the parties to live together as husband and wife. No witness heard them say, in words, in the presence of each other, "We have agreed to take each other as husband and wife, and live together as such." But their conduct towards each other, from the time they left Alexandria in 1865 up to the death of James Travers in 1883, admits of no other interpretation than that they had agreed, from the outset, to be husband and wife. And that agreement, so far as this record shows, was faithfully kept up to the death of James Travers. When it is remembered that James Travers assured the woman Sophia that they were as much married as if they had been married by a priest or minister; that in his mortgage of 1867 she is described as his wife; that in the holographic will of 1881 he recognized her as his wife; that in his last will, made at his domicil in New Jersey, he referred to her as his wife, and devised by that will property to her while she remained his widow and did not contract another marriage; and that he made her the sole executrix of his will, describing her as his wife; when these facts are supplemented by the fact that they lived together, without intermission, in good faith, and openly, for more than eighteen years as husband and wife, nothing more is needed to show that he and the woman had mutually agreed to sustain the relation of husband and wife. Under the evidence in the cause they are to be held as having, prior to the death of James Travers, agreed *per verba de præsenti* to become husband and wife.

Did the law of New Jersey recognize them as husband and wife after they took up their residence in that State and lived together, in good faith, as husband and wife and were there recognized as such? Upon the authorities cited this question must be answered in the affirmative.

We are of opinion that even if the alleged marriage would have been regarded as invalid in Virginia for want of license, had the parties remained there, and invalid in Maryland for want of a religious ceremony, had they remained in that State, it was to be deemed a valid marriage in New Jersey after James Travers and the woman Sophia, as husband and wife, took up their permanent residence there and lived together in that relation, continuously, in good faith, and openly, up to the death of Travers—being regarded by themselves and in the community as husband and wife. Their conduct towards each other in the eye of the public, while in New Jersey, taken in connection with their previous association, was equivalent, in law, to a declaration by each that they did and during their joint lives were to occupy the relation of husband and wife. Such a declaration was as effective to establish the status of marriage in New Jersey as if it had been made in words of the present tense after they became domiciled in that State.

The views we have expressed find support in the authorities. In *Meister* v. *Moore*, 96 U. S. 76, 79, it was said that an informal marriage by contract *per verba de præsenti* constituted a marriage at common law, and that a statute simply requiring "all marriages to be entered into in the presence of a magistrate. or clergyman, or that it be preceded by a license, or publication of banns, or be attested by witnesses," may be construed "as merely directory, instead of being treated as destructive of a common law right to form the marriage relation by words of present assent."

In *Maryland* v. *Baldwin*, 112 U. S. 490, 494, 495, the court said: "It is proper to say that, by the law of Pennsylvania, where, if at all, the parties were married, a marriage is a civil contract, and may be made *per verba de præsenti*, that is, by words in the present tense, without attending ceremonies, religious or civil. Such is also the law of many other States in the absence of statutory regulation. It is the doctrine of the common law. But where no such ceremonies are required, and no record is made to attest the marriage, some public recogni-

tion of it is necessary as evidence of its existence. The protection of the parties and their children and considerations of public policy require this public recognition; and it may be made in any way which can be seen and known by men, such as living together as man and wife, treating each other and speaking of each other in the presence of third parties as being in that relation, and declaring the relation in documents executed by them whilst living together, such as deeds, wills, and other formal instruments."

So in *Hoggan* v. *Craigie*, Macl. & Rob. 942, 965, in which Lord Chancellor Cranworth, referring to contracts of marriage *per verba de præsenti,* said: "It is not necessary to prove the contract itself; *it is sufficient if the facts of the case are such as to lead to satisfactory evidence of such a contract having taken place;* upon this principle the acknowledgment of the parties, their conduct towards each other, and the repute consequent upon it, may be sufficient to prove a marriage. . . . Everything, therefore, is pertinent and relevant in an inquiry like the present, which indicates the present or previous consent of the parties." Again, in *Campbell* v. *Campbell*, known as the *Breadalbane Case*, L. R. 1 Sc. App. 182, 192, 196, 211, Lord Chancellor Chelmsford said: "Habit and repute arise from parties cohabiting together openly and constantly, as if they were husband and wife, and so conducting themselves towards each other for such a length of time in the society or neighborhood of which they are members as to produce a general belief that they are really married." In the same case Lord Westbury, after observing that it might not be strictly correct to speak of cohabitation with habit and repute as a mode of contracting marriage, said: "It is rather a mode of making manifest to the world that tacit consent which the law will infer to have been already interchanged. If I were to express what I collect from the different opinions on the subject I should rather be inclined to express the rule in the following language: that cohabitation as husband and wife is a manifestation of the parties having consented to contract the relationship *inter se.*

It is a holding forth to the world by the manner of daily life by conduct, demeanor, and habit, that the man and woman who live together have agreed to take each other in marriage and to stand in the mutual relation of husband and wife; and when credit is given by those among whom they live, by their relatives, neighbors, friends, and acquaintances, to these representations and this continued conduct, then habit and repute arise and attend upon the cohabitation. The parties are holden and reputed to be husband and wife; and the law of Scotland accepts this combination of circumstances as evidence that consent to marry has been lawfully interchanged." In his Treatise on Domestic Relations, Eversley says: "Marriage may also be proved between the parties by their conduct towards each other, and the first consent need not be proved; 'it is sufficient if the facts of the case are such as to lead to satisfactory evidence of such a contract having taken place; the acknowledgment of the parties, their conduct toward each other, and the repute consequent upon it, may be sufficient to prove a marriage' " p. 41. See also 2 Greenleaf on Evidence (Harriman's ed.), §§ 461, 462, and notes; 3 Wigmore on Evidence, §§ 2082, 2083, and authorities cited.

Without further discussion or citation of authorities, we adjudge that the courts below did not err in holding that, under the evidence, James Travers and the Mrs. Travers who lived with him constantly and openly as his wife for more than eighteen years, were, in law, to be deemed husband and wife at the time of his death, in New Jersey, in 1883. It results from this view that the decree of the Court of Appeals, affirming the decree of the Supreme Court of the District, must itself be affirmed.

*It is so ordered.*

Mr. Justice McKenna and Mr. Justice Moody did not participate in the decision of this case.

Mr. Justice Holmes, dissenting.

I feel some doubts in this case which I think that I ought

to state. I understand it to be assumed, as it must be admitted, that James Travers and Sophia V. Grayson lived together for many years, calling themselves man and wife, when they were not man and wife and probably knew that they were not man and wife. This condition of things lasted from 1865, the time of the pretended marriage in Virginia to which their cohabitation referred for its justification, until 1883, the year of James Travers' death. So long as they lived in Maryland, that is until some time in 1883, if they had attempted to make their union more legitimate by simply mutual agreement they could not have done it. Therefore the instances of James Travers calling Sophia his wife during that period may be laid on one side.

Just before he died Travers moved to New Jersey and there made his will. As in Maryland, he spoke of his wife in that instrument, and as I understand it, the decision that he was married must rest wholly on this recognition and the fact that in New Jersey a marriage may be made without the intervention of a magistrate. I do not see how these facts can be enough. Habit and repute might be evidence of a marriage when unexplained. But they must be evidence of a contract, however informal, to have any effect. When an appellation shown to have been used for nearly eighteen years with conscious want of justification continues to be used for the last month of lifetime, I do not see how the fact that the parties have crossed a state line can make that last month's use evidence that in that last moment the parties made a contract which then for the first time they could have made in this way.

It is imperative that a contract should have been made in New Jersey. Therefore even if both parties had supposed that they were married instead of knowing the contrary it would not have mattered. To live in New Jersey and think you are married does not constitute a marriage by the law of that State. If there were nothing else in the case it might be evidence of marriage, but on these facts the belief, if it was entertained, referred to the original inadequate ground.

*Collins* v. *Voorhees,* 47 N. J. Eq. 555. A void contract is not made over again or validated by being acted upon at a time when a valid contract could be made. When a void contract is acted upon, the remedy, when there is one, is not on the contract, but upon a quasi-contract, for a *quantum meruit.* There is no such alternative when a marriage fails.