Estes, et al. *v.* McCaskill.

Dec. 14, 1953

No. 39002 46 Adv. S. 42 68 So. 2d 495

314

*Leslie Darden,* New Albany ; *R. L. Smallwood, Jr., Chester L. Sumners,* Oxford, for appellants.

315

*Thos. J. Tubb,* West Point; *Harold D. Geffen,* Beverly Hills, California, for appellee.

LOTTERHOS, J.

This is an interlocutory appeal from a decree of the chancery court in the Estate of Malcolm N. McCaskill, making a statutory widow's allowance to Mrs. Lois M. McCaskill. The important question passed upon by the court below and involved on this appeal is whether or not Mrs. McCaskill, the appellee, was the common-law wife of Mr. McCaskill at the date of his death on March 20, 1952.

It is necessary that the basic facts be stated at the outset for a proper understanding of the matters involved. Mr. McCaskill was an oil man, and in the fall

of 1951 was engaged in drilling for oil and gas on what was known as the Muldon Block near Aberdeen, in association with two other men—Mr. Howard G. Nason and Mr. Charles H. McCamic. On or about November 6, 1951, they brought in a well. This discovery well apparently caused the three associates to become suddenly wealthy and it placed them in a position where important business contracts and negotiations had to be consummated.

Mr. McCaskill appears to have been a heavy drinker and in fact a confirmed alcoholic. It appears that after the discovery well was brought in, he remained under the influence of liquor for a good portion of the time, so that his associates were in a critical position on account of their inability to get him to sign necessary contracts. In this situation, one of the associates, understanding that Mr. McCaskill was very fond of his former wife, the appellee here, who resided in California, telephoned her and requested that she come to Mississippi in order to try to "sober up" Mr. McCaskill. She consented to do so.

When Mr. McCaskill learned that she was coming to Mississippi, he "sobered up" and remained sober thereafter for a considerable time. On November 23, 1951, he obtained a marriage license in anticipation of Mrs. McCaskill's coming to Mississippi, and on the next day, November 24, he met her in Memphis at the plane and brought her back to the hotel in Aberdeen where he was then residing. Several of Mr. McCaskill's friends, understanding that there was to be a marriage, sent flowers to the hotel room. It appears that, up to this time, Mr. McCaskill had thought that Mrs. McCaskill had divorced him in California at some time in the past, as they had not lived together since about 1946. When they arrived at the hotel from Memphis, Mrs. McCaskill stated to some of his friends and in Mr. McCaskill's presence, after something had been said about congratulations being in order—"Well, no, I have never divorced him. Mac said he thought I had, but I didn't."

318

Mr. and Mrs. McCaskill spent the night of November 24, 1951, in his room at the hotel. The next day they went to visit her brother in Alabama and remained there overnight, Mr. McCaskill returning to Aberdeen the next day for business reasons. Mrs. McCaskill remained at her brother's house until the day following, and then she returned to Aberdeen. Thereafter, Mr. and Mrs. McCaskill lived together at the hotel in Aberdeen until December 4, on which day she started on her return trip to California. While Mrs. McCaskill was in Aberdeen, Mr. McCaskill gave her $10,000 and also a new Cadillac automobile. He also gave her son, hereinafter mentioned, $1,000, which he sent to him to aid in his education.

At this point, it is noted that the testimony of many witnesses overwhelmingly shows that during the time that Mrs. McCaskill was in Mississippi from November 24 to December 4, 1951, she and Mr. McCaskill were generally known as husband and wife, held themselves out to their friends and associates as such, and acted in every way as if they were married people. It appears to have been the general understanding in the community that they were husband and wife by virtue of their marriage of years before, which it was understood had not been dissolved by a divorce, although they had been separated for a long time. It is unnecessary to detail all of the evidence on this proposition but it is comprehensive and convincing.

Mr. and Mrs. McCaskill were originally married in March, 1935. There were no children of this marriage. Mr. McCaskill had previously been married and he had two children by his first marriage, they being the appellants, Mrs. Pat Estes and Mrs. Betty Fambro. Mrs. McCaskill had also been married prior to her marriage to Mr. McCaskill and she had one child by that first marriage, Max Anthony, who was, at the time of trial, a young man about 22 years of age, who lived with his mother in California. After Mr. and Mrs. McCaskill

were married in March, 1935, they lived together until 1939, when Mrs. McCaskill left him and went to California. They had previously resided in Mississippi and Alabama. Later, Mr. McCaskill went to California and they lived together there from time to time, but not continuously. He left California about 1946. It appears that about 1942, Mrs. McCaskill filed a suit for divorce against him in California. The only part of that divorce proceeding which appears in the record is the final decree dated October 7, 1943. It recites that an interlocutory judgment had been entered on September 30, 1942, adjudging that the plaintiff was entitled to a divorce, and also recites that more than a year had passed, no appeal had been taken, no motion for new trial had been granted, and the action had not been dismissed. The decree then recites, ''Now, upon the Court's own motion, it is adjudged that plaintiff be and is granted a final judgment of divorce from defendant * * *.''

When Mrs. McCaskill returned to California on December 4, 1951, in her automobile, her brother, Mr. B. L. Maxham, and Mr. McCaskill's sister, Mrs. Mary C. Finch, went with her. It appears from the evidence that Mrs. McCaskill owned or was buying a home in Los Angeles where she lived and that she had for a long time been employed as the manager or cashier of a restaurant in that city. Mrs. McCaskill's mother, who was in very bad health, lived with her. There is testimony in the record that the plan was for Mrs. McCaskill to arrange to settle up her affairs in California and then return to Mississippi as the wife of Mr. McCaskill.

On December 24, 1951, Mr. McCaskill went to Los Angeles by plane and he remained there until December 28, when he returned to Mississippi. There is some conflict in the testimony about the occurrences in California during this Christmas visit. The proof offered by the appellee, Mrs. McCaskill, is to the general effect that Mr. and Mrs. McCaskill were together a great deal during

that time and that their relationship remained the same as when she was in Mississippi. To the contrary, there is some proof to indicate that he was intoxicated most of the time in California and that the relationship did not continue.

After Mr. McCaskill returned to Mississippi, he purchased a house in Houston, Mississippi, in which city he and Mrs. McCaskill had lived at one time, and he began to furnish and equip the house as a home. There is considerable testimony that he was preparing it as the home in which he and the appellee were to live when she returned to Mississippi. The house was completely furnished and ready for occupancy just a few days before his death. There is much testimony in the record with respect to the love of each of these parties for the other.

Immediately after the death, intestate, of Mr. McCaskill on March 20, 1952, Mrs. McCaskill returned to Mississippi. In due course an administration proceeding was begun, upon the petition of all of the interested parties, with a recital in the petition to the effect that the status of Mrs. McCaskill as his widow was at the time not determined and was uncertain by reason of a divorce proceeding in California and that the exact relationship to the deceased was yet to be determined. It was testified that this recital was contained in the petition to protect the rights of the parties when the facts should be developed. In the course of the proceedings for administration of the estate, the petition now before the court was filed by Mrs. McCaskill, setting up that she was the wife and is the widow of Mr. McCaskill and praying that the court set aside to her an allowance under the statute as widow. Inasmuch as the final decree of divorce between these parties was entered in the California court in October, 1943, the question before the court is whether Mrs. McCaskill became the common-law wife of her former husband on and after November 24,

1951, when they lived together and held themselves out to the public as husband and wife.

We have not undertaken to set out the evidence in this opinion in detail, and the above outline of the facts omits many items of proof which are in the record. However, we feel that this outline will give a substantial picture of the facts out of which the questions of law arise. After hearing the evidence, the chancellor held that Mrs. Mc-Caskill was the common-law wife of Mr. McCaskill and, therefore, is his widow and entitled to the rights of a widow. As indicated by his written opinion, the chancellor reached the conclusion which he did upon a finding that Mrs. McCaskill "did not have knowledge of this final judgment of divorce" and that "Mr. McCaskill knew this situation and knew that his wife believed that she had not divorced him." His opinion then continues as follows: "If the case were being tried between Mr. McCaskill and Mrs. McCaskill, he would be estopped to deny the existence of the common-law marriage. For the same reason, his daughters are likewise estopped to deny this common-law marriage. The court holds that there was a bona fide intent on the part of Mr. and Mrs. Mc-Caskill to assume the relationship of husband and wife, and that, pursuant to this intent, they became common-law husband and wife with all the essential elements of this re'ationship being shown, and this in spite of Mrs. McCaskill's mistaken opinion that the interlocutory decree of divorce had not been made final."

We reach the conclusion that the chancellor was correct in his decision that Mrs. McCaskill is the widow of Mr. McCaskill and that there was in fact a valid common-law marriage between them in November, 1951. However, we do not concur with the reasons given by the chancellor for that result. Our view of this case may be summarized in short as follows:

(1) The record shows without any doubt that, after Mrs. McCaskill came to Aberdeen and advised Mr.

McCaskill that they were still married and that she had never obtained a divorce, he, in good faith, believed what she told him and that they were man and wife under the original marriage, and that, so believing, he undertook to renew the original relationship with her. In other words, we hold that the chancellor's finding that Mr. McCaskill was aware of the true situation, that is, that there was a final divorce between the parties, is manifestly wrong. (2) The chancellor's finding that Mrs. McCaskill did not have knowledge of the final judgment of divorce is sustained by the record, although the matter would not be free from doubt if it were here for original decision on the facts. (3) Since we approach the legal questions involved on the basis that both of the parties believed in good faith on November 24, that their original marriage had not been dissolved by a final divorce, we do not find it necessary to comment upon the questions of estoppel mentioned by the chancellor and discussed in the briefs. (4) We conclude as a matter of law that when these two parties entered into the relationship of husband and wife in good faith, under the mistaken belief that they had the right to do so because their marriage of 1935 had never been finally dissolved, they thereby created a valid common-law marriage relationship between them. It is this last proposition of law which we will discuss with citation of authorities upon which we rely in this opinion.

We have in mind in the consideration of this case, as did the chancellor, the rule as stated in U. S. F. & G. Co. v. Smith, 211 Miss. 573, 52 So. 2d 351, that: "A claim of common-law marriage is regarded with suspicion and will be closely scrutinized. Thus, in order to establish a common-law marriage, all the essential elements of such a relationship * * * must be shown by clear, consistent, and convincing evidence, especially must all the essential elements of such relationship be shown when one of the parties is dead."

The good faith of these parties, as found by the court below, and the fact that they lived together and held themselves out as husband and wife, are overwhelmingly established by the evidence. The finding of the chancellor that Mrs. McCaskill did not know there had been a final divorce is supported by the proof. The final decree in 1943 recites that it was "upon the Court's own motion" based on an interlocutory decree made more than a year before. There is nothing to show notice of the final decree. Mrs. McCaskill told her former husband and his friends on November 24, 1951, that she had not divorced him. For example, she stated in the presence of Mr. Robert Mims, a friend of Mr. McCaskill, that she had always been married to him and that they had not just been married. This was shortly after she came to Aberdeen. She stated to one of the appellants when she saw this appellant in Texas on the way back to California early in December, 1951, that she and the appellant's father were not divorced. Also, Mrs. McCaskill resumed the original relationship with her former husband in such a manner as to indicate that she believed he was still her husband, unless it is to be assumed that she knowingly entered into an illicit relationship with him, and there is nothing in the record to point to this conclusion.

With reference to our holding that the chancellor is not supported in his finding that Mr. McCaskill was aware of the true situation and knew that there was a final divorce between the parties when they were reunited in Aberdeen in November, 1951, we now refer to some elements in the record which have brought us to this decision. In the first place, it is shown that Mr. McCaskill loved his former wife with great devotion. Although he apparently believed, prior to her arrival in Aberdeen, that there had been a divorce, it is obvious that he intended to remarry her, because he obtained a marriage license on November 23, as soon as he knew that she was coming. The fact that he told his friends

about the approaching marriage is shown by their sending flowers to the room and offering to extend congratulations to him and his wife upon their arrival at the hotel. There is testimony that Mr. McCaskill was a man who had many friends and liked to be "looked up to" in the community as an important person. He did not use the marriage license, after Mrs. McCaskill advised him that there had not been a divorce, but he immediately resumed the original relationship of husband and wife with her openly and apparently with great pride. Within a short time he purchased a home and had it fully equipped and furnished with the expectation, according to the proof, of living there with his wife. It is inconceivable to us that it can be said from this record that Mr. McCaskill knew all the time that there was a divorce and that he was taking advantage of his former wife's lack of knowledge thereof to enter into an illicit relationship with her. The whole record shows that his great desire was to be her husband again. He had every reason to accept at face value her statement to him to the effect that it would not be necessary to use the marriage license and get married again as they were still married. She was the party who had applied for the divorce originally and he would naturally assume that she would know whether it had ever become final. All of this is particularly true in view of the chancellor's specific finding that the parties acted in good faith. We are fortified in our holding that the chancellor was wrong in finding that Mr. McCaskill knew the true situation, by this language in appellants' brief: "The Chancellor found * * * that McCaskill knew he and Lois were were divorced. From the whole record appellants' position is that in this finding the Chancellor was manifestly wrong."

It has often been stated that the agreement for the creation of a common-law marriage must be unequivocal and free from any reservations, mental or otherwise,

and that there must be an actual agreement between the parties entered into in good faith whereby they undertake to become husband and wife as of the time of the agreement. However, it is not necessary, according to our view, that the parties shall, at the time, be aware of the fact that they are not already married, and enter into an agreement designed to create a new relationship of husband and wife. It is sufficient if parties enter into the relationship of husband and wife in good faith, believing that they are already man and wife, and agreeing to live together in that relationship under the sanctity of what they erroneously consider to be an already existing marriage. We come now to the authorities in support of this proposition.

The leading case is Travers v. Reinhardt, 205 U. S. 423, 51 L. Ed. 865. In this case it became necessary to determine whether James Travers and Sophia Travers were lawfully married at the time of his death. These parties went through an apparently invalid marriage ceremony in 1865 in Alexandria, Virginia. The parties immediately went to New Jersey and remained there a short time as husband and wife. They then moved to Maryland and resided there as husband and wife until some time in 1883, when they moved to New Jersey and resided there until Mr. Travers' death on November 1, 1883. During all of the time from 1865 to 1883, they acted as if they were lawfully husband and wife and they were regarded as such in the communities where they lived. For purposes of the decision, it was assumed that the original marriage ceremony in Virginia did not constitute a valid marriage, and that their long residence in Maryland did not create a marriage relationship, because of the absence of a religious ceremony as required in that state. The court then approached the question whether the parties became husband and wife in New Jersey, where common-law mar-

riages were recognized, and, in holding that there was a valid common-law marriage in New Jersey, said:

"Did the law of New Jersey recognize them as husband and wife after they took up their residence in that state and lived together, in good faith, as husband and wife, and were there recognized as such? Upon the authorities cited this question must be answered in the affirmative.

"We are of the opinion that even if the alleged marriage would have been regarded as invalid in Virginia for want of license, had the parties remained there, and invalid in Maryland for want of a religious ceremony, had they remained in that state, it was to be deemed a valid marriage in New Jersey after James Travers and the woman Sophia, as husband and wife, took up their permanent residence there and lived together in that relation, continuously, in good faith, and openly, up to the death of Travers, being regarded by themselves and in the community as husband and wife. Their conduct towards each other in the eye of the public, while in New Jersey, taken in connection with their previous association, was equivalent, in law, to a declaration by each that they did, and during their joint lives were to, occupy the relation of husband and wife. Such a declaration was as effective to establish the status of marriage in New Jersey as if it had been made in words of the present tense after they became domiciled in that state."

This Court has cited the Travers case with approval in Sims v. Sims, 122 Miss. 745, 85 So. 73. In that case, the husband filed suit against his wife for an annulment, or, in the alternative, for a divorce. There was an appeal from an interlocutory decree awarding the wife alimony *pendente lite*. This decree was affirmed. The facts were that at the time of the marriage between the parties the wife had a living husband by a previous marriage. She and the appellant were mar-

ried in Indiana in 1893. In 1902, the wife sued for and obtained a divorce from her first husband, Perrin, in Chicago. Thereafter, the appellant, Mr. Sims, and the appellee, Mrs. Sims, continued to live together as husband and wife, and were so considered by themselves and the public for many years. They moved to Mississippi and lived there for twelve years immediately preceding 1918, at which time this suit was begun. It was testified by Mrs. Sims that, after her first husband deserted her, he wrote to her, stating that he had obtained a divorce, and that she believed this to be true and so informed Mr. Sims prior to their marriage. She further testified that she obtained the divorce from her first husband in 1902 after she learned that there was in fact no divorce. In this situation, the Court, in holding that there was a valid common-law marriage in Mississippi, said:

"The marriage of the appellee to the appellant in 1893 at Crownpoint, Ind., being void for the reason that she was then the wife of another, the question for decision is whether or not their relations after the appellee obtained the divorce from Perrin in *1903* has resulted in a common-law marriage. * * * * *

"It is not clear, or at least we will assume that it is not, from the appellee's testimony, that she and the appellant entered into a new marriage agreement after she obtained the divorce from Perrin, but no such new agreement was necessary, for the reason that her marriage with the appellant in Indiana was entered into by both of them, according to her testimony, which the court evidently accepted as true, in good faith, under the belief that her marriage with Perrin had been dissolved, and after its dissolution in 1902 they, the appellant and the appellee, continued in good faith to live together as, and considered themselves to be, husband and wife.

" 'Their conduct towards each other in the eye of the public (after the removal of the impediment to their

marriage) taken in connection with their previous association, was equivalent in law to a declaration by each that they did, and during their joint lives were to, occupy the relation of husband and wife.' Travers v. Reinhardt, 205 U. S. 423, 27 Sup. Ct. 563, 51 L. Ed. 865.

"There has been considerable discussion as to whether a new marriage agreement must be entered into upon the removal of an impediment to a valid marriage of persons cohabiting as husband and wife. The cases dealing therewith seem to be divided into three classes, as will appear from a collation thereof in note to Turner v. Williams, 3 A. R. C. 165, and 18 R. C. L. 436. The first class, which seems to be in the majority, holding that no such new agreement is necessary in any case; the second, that no such new agreement is necessary where the marriage void because of an impediment thereto was contracted in good faith; and the third, and this class seems to be in the minority, that such new agreement is necessary in all cases. * * * * *

"That it does not appear from the evidence where the parties hereto lived after the rendition of the decree divorcing the appellee from Perrin until they came to Mississippi, which seems to have been in the year 1906, is of no consequence, for the reason that, whether or not their relations resulted in a valid marriage in any state in which they may have lived after the rendition of the Perrin divorce decree and before they came to Mississippi their conduct towards each other here, 'taken in connection with their previous association, was equivalent in law to a declaration by each that they did, and during their joint lives were to, occupy the relation of husband and wife.' Travers v. Reinhardt, 205 U. S. 423, 27 Sup. Ct. 563, 51 L. Ed. 865.''

This Court has also cited the Travers case with approval in Walker v. Matthews, 191 Miss. 489, 3 So. 2d 820; and, in the case of Jourdan v. Jourdan, 181 Miss. 176, 179 So. 268, this Court cited and followed the Sims

case, making the following statement with reference thereto:

"* * * The parties moved to Mississippi, and continued to live together and hold themselves out as husband and wife, without any specific agreement having been made after the death of the former spouse. The wife afterwards sued for alimony and support; whereupon it was contended that there was no marriage, because there was no specific agreement after the removal of the obstacle which originally rendered the marriage void; but the court held that there was a common-law marriage and sustained the suit for alimony."

Of course, there is no rule of law preventing persons who were formerly married and then divorced from entering into a valid common-law marriage, if the facts· sustain it. Oatis v. Mingo, 199 Miss. 896, 26 So. 2d 453. We conclude that the underlying principle of the Travers case and the Sims case applies to the situation before the Court on the present appeal. In those cases and in the case at bar, the parties were living together as husband and wife in the belief that the relationship existed because of a marriage ceremony of some years before, and without any present agreement to enter into a new marriage relationship. In the one case it was held that when they went to New Jersey where common-law marriages were recognized and continued to live as husband and wife in good faith, they thereby became validly married. In the other case, the same result followed when the parties moved to Mississippi where commonlaw marriages are recognized. In our present case there was no disability which was removed after the ceremonial marriage, as in the Sims case, but the same principle applies because there was the good faith continuance of the marriage relationship in the belief that the parties were already husband and wife.

As supporting the doctrine applied in this case, although not directly in point, we note Navarro, Inc. v.

Baker, (Fla.) 54 So. 2d 59; and In Re Sheedy, 178 N. Y. S. 863, affirmed, 129 N. E. 919.

Appellants rely on Clack v. Williams, (Tex. Ct. Civ. App.) 189 S. W. 2d 503, which is contrary to our decision, now made. We have carefully examined that case, and decline to give any weight to it, as we consider it unsound. In this connection, we note that the Clack case was mentioned but not followed in a later Texas case, which harmonizes with our present holding. See Consolidated Underwriters v. Taylor, (Tex. Ct. Civ. App.) 197 S. W. 2d 216. In this case, Mary and Melvin Taylor entered into a ceremonial marriage, at a time when he, unknown to her, had another wife living. Thereafter, the husband divorced his first wife. He and Mary continued to live together. It was stipulated that after the ceremonial marriage there was never any agreement between Mary and Melvin Taylor to become man and wife. Nevertheless, the court held that there was a valid common-law marriage between them, after the impediment was removed, and, in the opinion, said:

"* * * From the record, Mary entered into the ceremonial marriage in good faith, believing that her marriage was lawful and not knowing at any time of the impediment which rendered it unlawful at its inception. In the very nature of the marriage relation, the continued living together of Mary and Melvin as husband and wife after the removal of the impediment which rendered the original marriage invalid was necessarily a constant offer and acceptance of the mutual relation of husband and wife between the parties, and their cohabitation under such circumstances constituted the lawful relation of husband and wife. Their continued living together as husband and wife after the impediment was removed, Mary not knowing of the existence of the impediment nor of its removal, did not merely raise an inference of an agreement of marriage, which would have been rebutted by the stipulation and the testimony

to the effect that no subsequent agreement of marriage was ever made, but this continued living together as husband and wife after the removal of the impediment constituted the lawful relation of husband and wife.''

We are satisfied that under the facts shown in this record the appellee is the lawful widow of the deceased, Malcolm N. McCaskill. These persons entered into the relationship of man and wife, and held themselves out to the public as such, on and after November 24, 1951, in good faith, believing that they had the right so to do under their ceremonial marriage of 1935. Under the findings of fact as settled in this Court, they did not know they were divorced. It was not necessary that they consciously make an agreement for a new marriage, when they honestly believed that they were already husband and wife, and intended to resume their former marriage relationship.

For the reasons stated, we affirm this case, and, since this is an interlocutory appeal, we remand it to the court below.

Affirmed and remanded.

*McGehee, C. J.,* and *Kyle, Arrington,* and *Ethridge, JJ.,* concur.