WALKER *et al. v.* MATTHEWS *et al.*

(In Banc. Sept. 22, 1941.)

[3 So. (2d) 820. No. 34529.]

**J. C. Floyd,** of Meridian, for appellants, Mack Walker and Harriet Davis.

**H. A. Shotts,** of Meridian, for appellant, Mattie Tate Matthews.

**Williamson & Riddell,** of Meridian, for appellant, Eleanor Matthews.

**Graham & Graham**, of Meridian, for appellees.

Argued orally by **Nate S. Williamson** and **H. A. Shotts,** for appellants, and by **S. M. Graham** and **Hardy Graham,** for appellees.

**Roberds, J.,** delivered the opinion of the court.

On the night of August 19, 1940, George Matthews, a negro, some seventy years of age, died, intestate, at his home five miles northwest of Meridian in Lauderdale County, Mississippi, where he lived alone. He had

some ten thousand dollars in cash, other personal property of small value, and his home, consisting of eighty acres of land.

Immediately there was a scramble for his property. Mack Walker and Harriett Davis, claiming to be second cousins and heirs at law of Matthews, filed a petition in the chancery court of Lauderdale County under sections 359 and 360 of the Code of 1930 to have determined who were his legal heirs. They made parties to this petition a number of persons claiming to be collateral heirs of decedent and also one Mattie Tate Matthews and one Fannie, or Tiney, Collins Matthews, claiming to be widows of decedent, and one Will Matthews, son of Fannie Matthews, claiming to be the lawful son and heir of George Matthews.

The chancellor on the hearing limited the evidence and trial to the questions (1) whether either Mattie or Fannie was the lawful widow of decedent, and, if either, which one, and (2) if Fannie were such widow, whether her son, Will, or Pippen-Cat, as he was usually called, was the legitimate child of George Matthews and entitled to inherit his estate along with his mother Fannie, for if there is a widow or a child entitled to inherit, the collateral heirs are excluded.

After an extended trial, lasting some four days, the chancellor found that Fannie was the common-law wife of George Matthews and Will was his legitimate son and that they, Fannie and Will, were his only heirs at law. From that finding and decree this appeal is taken.

The questions, therefore, for decision on this appeal are (1) whether Mattie or Fannie or either is the lawful widow of George Matthews, and, if either, which, and (2) if either is his widow, whether such widow is entitled to inherit his property, and (3) whether Will is his legitimate son and entitled to share in such inheritance.

We will try to weave into the warp of the life of this Lothario the woof of his nuptial and concubinage experiences in an effort to picture the fabric of his earthly ex-

istence. He appears to have about lived to the limit of his physical and mental powers. He was a fireman on a railroad, and, like the sailor with a sweetheart in every port, it was his desire to have one at each depot along his route. As he neared the end of life's run we find him returning to the old home, and, as his engine was pulling into the terminal and its fires were burning low, sitting on his front porch, murmuring over and trying to read his Bible. That night the fires went out.

In 1898 he was a young man, living on this same farm with his mother, his father being dead. Already he was the father of an illegitimate child, and, wonder of wonders, the mother of this child, who testified on the hearing, did not claim to be his common-law wife. He had already served a term in the Mississippi penitentiary.

His mother died in 1899. He went away for a while, and when he returned he brought back a girl named Lillie Mason. Just where he met her is not shown. She was born and reared and had lived at Marion Junction, Dallas County, Alabama. He brought her either from Mobile or New Orleans, the witnesses were not sure which place he said. He said he had married her and he introduced her as his wife. He lived with her as his wife at the old homeplace. He held her out in the community as his wife. It is not shown whether there was a license or a marriage ceremony at any place. He would go away for short times and leave Lillie with Mr. and Mrs. Pearce, neighbors, living about 150 yards from his home. Mr. Pearce operated a store. He testified in the case. At the time of the trial he was mayor of Shuqualak, Mississippi. George told Mr. and Mrs. Pearce to take care of Lillie while he was gone and to let her have from the store what she needed and he would pay for it. This was done. Lillie worked and cooked for Mr. and Mrs. Pearce during the times George was gone and apparently some of the time when George was at home. This situation continued until 1902, when George got a job as a railroad fireman with the Southern Railway Company. His first run was

from Selma, Alabama, to Rome, Georgia. Later he fired on a switch engine on the yards at Selma. Selma was a division point on the railroad. It was necessary that George live in Selma to do his railroad work. George carried Lillie to Selma in 1902 and placed her in a house "just across the railroad from the depot." Here they lived together as man and wife, holding themselves out as such, until she died in 1911. George paid all the expenses of her last illness, engaged a nurse for her and buried her at the family cemetery, "Shady Rest," at Masillon, about two miles west of Marion Junction. George and Lillie had no children. The testimony is abundant to prove all the common-law elements of a common-law marriage between them beginning in 1899 and continuing until the death of Lillie in 1911.

We now take up the thread of Fannie Collins. She was reared in Choctaw County, Alabama. Lauderdale County joins Clarke County, Mississippi, on the north; Choctaw County, Alabama, lies immediately to the east of Lauderdale and Clarke Counties; on the east of Choctaw County is Maringo County and on the east of Maringo is Dallas County. Therefore, Choctaw County is between Selma and Meridian. George appears to have met Fannie at Christmas, 1902, and Fannie's pleadings say she and George began to live together about January, 1903. There is proof to the effect that George and Fannie then lived together for awhile at Marion Junction, which is twelve miles west of Selma. This was a junction point on the railroad; the trains operated over a "Y" to change their courses to Akron, Meridian and Mobile. Some of the train crews had a meal there; the trains remained there from ten to thirty minutes. It is claimed for Fannie that she and George lived at Marion Junction as man and wife until their son Will was born, October 16, 1903, and there is proof to that effect, although it is far from satisfactory. Fannie then claims, and there is proof to sustain the claim, that she and George went through a ceremonial licensed marriage on April 1, 1904, at the

house of her grandmother, Martha Pressley, four miles west of Enterprise, Clarke County. Will was left at Martha's and Fannie and George went back to Marion Junction and continued to live there as man and wife, according to Fannie's proof, until around the first of 1905, when Fannie left George and went back to her mother's in Choctaw County. At any rate, on March 11, 1905, about eleven months after she claims to have married George, we find Fannie going through a statutory, licensed, ceremonial marriage at Butler, county site of Choctaw County, Alabama, with one George Jones, sometimes called Seale or Brewster. In this license she is designated Tiney Collins. Tiney and Jones lived together as man and wife in the neighborhood where they were married until the fall of 1911, when Fannie left Jones and went to Quitman, Clarke County, Mississippi. Some of the witnesses say she went with a man named Brown. She appears to have worked at Quitman for a short time at a hotel, when she went to Louisiana, in which state she seems to have since resided and in which she lived at the time of the trial. Tiney and Jones had at least two, and maybe, three, children. It is claimed Will, or Pippen Cat, was their child. Later, after going to Louisiana, Fannie went by the name of Munday and at the time of the trial was known as Marsh. In 1912 Jones was killed near Butler, Alabama.

We go back now and take up another thread. During the last illness of Lillie in 1911 George had procured a nurse for her whose name was Mattie Tate. She lived at Selma and was around 16 years old, about George's favorite age. Shortly after the death of Lillie and in 1912 George brought Mattie to Meridian, and there at Black's Hotel, operated by a negro, he went through a marriage ceremony with Mattie. The record is not specific whether it is claimed a license had been issued, but none is shown to have been issued, although witnesses detail the wedding ceremony. About this time George was transferred from Selma to Mobile, where he fired on

a switch engine until he retired on a railroad pension around 1938. He carried Mattie to Mobile and there they lived as man and wife, the exact time not being shown, perhaps from three to five years. Anyway, during that time, whatever its duration, they lived in the same house, held themselves out as man and wife and were known to the public as man and wife.

Sometime later, apparently during the period from 1914 to 1917, the time not being definitely shown, Mattie left George and returned to her old home at Selma, where she had continued to live to the time of the trial. On April 12, 1937, she married one Josh Minter in Dallas County, Alabama, under a statutory license, the application for which, made by Minter, said it was his second and Mattie's first marriage, and gave her name as Mattie Tate. She has two living children by Minter and at the time of the trial they were living together as man and wife at Selma. George and Mattie had no children.

Mattie's departure did not seem to greatly disturb George. We find him next at Hot Springs, Arkansas, at the boarding house of one Susie Cole. He procceded to marry the landlady's daughter, Jessie. This was a licensed, statutory marriage; it took place in Garland County, Arkansas, May 17, 1921. George, in some of his later conversations, intimated he did not marry Jessie; she married him. He said "she pulled down the shades and called the officers." Anyway, they were married and George until the day of his death recognized Jessie thereafter as his lawful wife. All of his railroad passes were issued to him and Jessie as his wife, even up to the last year of his life, although Jessie died September 13, 1927. In his application for railroad retirement pension October 29, 1937, he referred to Jessie as his wife.

Jessie did not like Mobile. She would go there about twice a year and remain with George a week or two. George did not appear to encourage these visits, because, as he said, each time she came it cost him $100. In fact George gave evidence of his feelings towards his mar-

riages, by saying to witnesses that his first marriage to Lillie cost him $2.50; his second to Mattie $5; and his third to Jessie $500. At this ratio George could not have married many more times. George and Jessie had no children.

So far as the record shows, this ends his matrimonial adventures, although after he came back to the old home on his retirement he did approach a lady friend of long ago with the suggestion he had plenty with which to take care of her if she cared to come and live with him. She did not accept.

We shall now undertake to unravel this tangled skein, apply the rules of law and presumptions and determine the rights of the parties.

And the first knot is that of Lillie and Fannie, and we find and hold that Lillie was the wife of George Matthews before and during the time of his relations with Fannie, and, being the husband of Lillie, he could not and never did become the legal husband of Fannie. We reach this conclusion through these processes:

1. George brought Lillie from another state. They said they were married. He introduced her as his wife and he lived with her as such. There is no other proof as to whether there was, or was not, a statutory or common-law marriage in the other state. In the absence of all proof to the contrary we must presume they had legally become man and wife in the other state. Annotations, 34 A. L. R. 371. As stated in Divorce and Separation in Mississippi by Amis, p. 24, sec. 10, "In general, the law favors marriage and will indulge every reasonable presumption in favor of the validity thereof. Alabama & V. Ry. Co. v. Beardsley, 79 Miss. [417], 422, 30 So. 660 [89 Am. St. Rep. 660]; Sullivan v. Knights 'of Pythias, 97 Miss. 218, 52 So. 360; McAllum v. Spinks, 129 Miss. 237, 91 So. 694." In 38 C. J., p. 1325, sec. 100, "If a marriage in fact is established by evidence or admission, it is presumed to be regular and valid, and the burden of adducing evidence to the contrary rests on the party who

attacks it, even though it involves the proving of a neg-
ative." In 35 Am. Jur., p. 303, sec. 191, it is said, "It is a
fundamental maxim of our law that where man and wo-
man are living together as husband and wife, marriage
should always be presumed." A contrary rule would be
dangerous to society. A man goes away to another state
for a time; he returns with a woman and they announce
they have married; they live together as man and wife;
they hold themselves out in the community as man and
wife; this situation continues for thirteen years and until
the death of the woman. What shall the law presume,
in the absence of proof to the contrary? That they are
living in a lawful or a criminal state? As was said in
Travers v. Reinhardt, 205 U. S. 423, 27 S. Ct. 563, 567,
51 L. Ed. 865, "The law has wisely provided that mar-
riage may be proved by general reputation, cohabitation,
and acknowledgment; when these exist, it will be in-
ferred that a religious ceremony has taken place; and
this proof will not be invalidated because evidence can-
not be obtained of the time, place and manner of the
celebration of the marriage. . . ."

2. The testimony is abundant to show all the elements
of fact of a common-law marriage between George and
Lillie from 1899 to her death in 1911. The Chancellor
stated his findings in these words: "It is also in evi-
dence that in 1899 George, who had been away from
his home west of Meridian for some months, came back
home with a woman named Lillie, and that he told people
that she was his wife, and lived with her as such. There
is no proof they were ever ceremonially married, or that
they were ever married in any way anywhere, but he
told people around there that she was his wife. This
woman stayed around there sometime; George would go
away and be gone two or three months and come back,
then he would stay with her awhile and leave again. That
kept up until 1902 when George went to Selma and got a
job as fireman on the locomotive of the Southern Railway,
when he took Lillie and installed her in a house right

across from the depot in Selma, and that he continued to live with her there until she died in 1911.''

We construe the evidence as establishing such facts much more strongly than did the Chancellor. It is true that common-law marriages were not recognized in Mississippi from 1892 to 1906, (Olivari v. Clark, 175 Miss. 883, 168 So. 465), but they were recognized in Alabama during the time George and Lillie lived together in that state. White v. Hill, 176 Ala. 480, 58 So. 444. The lower court attached much importance to the idea that the relation being unlawful in Mississippi it is presumed to have continued in that status in Alabama. The proof disproves the presumption. The only reason the relation was unlawful in Mississippi was because the law did not recognize common-law marriages, not because the elements thereof were not shown as facts. But the same facts were shown to exist after they went to Alabama and until the death of Lillie and common-law marriages were there recognized. In the Travers case, supra, it was announced that where parties lived together in Virginia and the relation was unlawful because of lack of a license, then moved to Maryland where such relation was unlawful because of lack of a religious ceremony, and then moved to New Jersey, where common-law marriages were lawful, that they became man and wife under the laws of New Jersey, where all the elements of fact of a common-law marriage were established in New Jersey. The facts existing while they were in Virginia and Maryland were important in determining the facts after going to New Jersey. Under the proof in this record George and Lillie became common-law man and wife in Alabama and under the law of comity it will be recognized here. Divorce and Separation in Mississippi by Amis, p. 24, sec. 10, citing Carroll v. Renich, 7 Smedes & M. 798, 26 Cyc. 829 to 831.

This status existed before and when George met Fannie; therefore, Fannie could not have become his wife. This makes it unnecessary for us to decide whether the

facts disclosed by this record are sufficient to constitute George and Fannie common-law husband and wife had there been no legal impediment to such status. It is also unnecessary for us to say what effect her statutory licensed marriage to George Jones in March, 1905, had upon her right to inherit the property of George Matthews.

It also follows from the foregoing that Will, or Pippen Cat, is not the legitimate son of George Matthews, if, in fact, he is his son at all. The great weight of the evidence shows he is in fact the son of George Jones and not of George Matthews, but it is not necessary for us to say whether we would reverse the finding of the chancellor on that question. It, therefore, follows that Will is not an heir at law of George Matthews.

We come now to the rights of Mattie. George went through a ceremony of marriage with her in Meridian, Mississippi, in 1912. It is not clear whether it is claimed there was a license. No license is shown to have issued and the witnesses do not undertake to say whether the preacher had a license at the time of the ceremony. Apparently he did not have such license. However, the ceremony was public evidence of their intention to assume the status of man and wife. There was no impediment and common-law marriages were then recognized in this state. They moved to Alabama and lived together as man and wife for some time, the exact time not being shown, but the evidence is sufficient to establish a common-law marriage. However, Mattie is not entitled to inherit from George for these reasons:

1. After their separation both George and Mattie went through statutory marriages, under regular licenses, and each thereafter recognized these marriages as valid and lawful, George with Jessie Cole until his death and Mattie with Josh Minter to the time of the trial, and, presumably, at this time, Mattie and Josh having at the time of the trial two living children. In Mississippi, and most of the states, the fact of a subsequent marriage is of itself

sufficient to raise a presumption that a former marriage has been terminated by a decree of divorce, in the absence of proof to the contrary. The presumption may be rebutted by proof but there is no proof here to rebut it. The proof could have been made, since George and Mattie, after their separation, have lived only in Mobile and Dallas Counties, Alabama, and George in Lauderdale County, Mississippi, for about a year and a half before his death. Annotation 34 A. L. R., subhead c, p. 476, citing Hull v. Rawls, 27 Miss. 471; Howard v. Kelly, 111 Miss. 285, 71 So. 391, Ann. Cas. 1918E, 1230; Alabama & V. R. Co. v. Beardsley, 79 Miss. 417, 30 So. 660, 89 Am. St. Rep. 660; Colored Knights of Pythias v. Tucker, 92 Miss. 501, 46 So. 51; Aldridge v. Aldridge, 116 Miss. 385, 77 So. 150; McAllum v. Spinks, 129 Miss. 237, 91 So. 694. The Tucker case, supra, discusses the sufficiency of proof necessary to overcome the presumption. See, also, Sullivan v. Grand Lodge K. of P., 97 Miss. 218, 52 So. 360; Hickman v. Hickman, 126 Miss. 469, 89 So. 6; Ladner v. Pigford, 138 Miss. 461, 103 So. 218. The burden of showing the invalidity of a marriage solemnized in due form is upon the person attacking it. Sullivan v. Grand Lodge, supra.

2. Another question which arises is whether Mattie is now estopped to claim she is the lawful wife of George and lay claim to his property as such. She went through a statutory, licensed marriage with Josh Minter. The application for the license gave her name as Mattie Tate and stated this was her first marriage. She is now living with him as man and wife at Selma and they have two children. The cases are divided on this question. An annotation in 71 A. L. R., subhead IV, p. 287, shows Colorado, California, South Carolina and North Carolina imposing an estoppel; Georgia, Arkansas and Oklahoma as not imposing such bar. In the Arkansas case, Estes v. Merrill, 121 Ark. 361, 181 S. W. 136, however, the wife believed in good faith a divorce had been granted and involved an attack on the validity of the divorce and a

claim of right of dower. This exact question has not been decided by this Court. In Williams et al. v. Lee et al., 130 Miss. 481, 484, 94 So. 454, 28 A. L. R. 1124, this Court held that failure of the wife to either encourage or dissent to the illegitimate marriage of her husband, mere knowledge and silence, did not estop her from asserting her heirship, citing Darrow v. Darrow, 201 Ala. 477, 78 So. 383, to the same effect. In Williams v. Johnston, 148 Miss. 634, 114 So. 733, this Court held that wilful desertion of the wife by the husband and subsequent marriage to another woman and living apart from her for thirty years estopped the husband from renouncing the wife's will and inheriting a child's part of her estate. In Joy v. Miles et al., 190 Miss. 255, 199 So. 771, we said: "When the proof discloses, as it does in this case, that a wife seeking to set aside an invalid divorce decree obtained by her husband had become married to another man subsequent to the rendition of such decree, it cannot be said that she comes into a court of equity with clean hands asking for affirmative relief. Moreover, even if it be true—and the chancellor found to the contrary— that she did not know of the decree at the time of her second marriage, such want of knowledge would afford less excuse for having entered into the bigamous relationship with her second husband than if she had known of the divorce proceedings, since she did know that her former husband was still alive, and that she herself had not obtained a divorce. Nor does the fact that she did not remarry until after her former husband had married another woman, following the rendition of the divorce decree in his favor, prevent his second wife from pleading such fact in defense of a suit to set aside the decree of divorce for the sole purpose of enabling the complainant in such a suit to obtain the life insurance left by the divorced husband at the time of his death, and which was payable to his widow."

The majority rule is that desertion or abandonment is generally held to be a bar to any right to share in the

estate of the deceased spouse.   Annotation 71 A. L. R., p. 285.

We hold that under the facts of the case at bar and the applicable rules of law Mattie Tate (Minter) is estopped to assert heirship to the estate of George Matthews, deceased.

Reversed and remanded.