# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-01533-COA

## CONSOLIDATED WITH:

## NO. 2011-CA-01451-COA

| | |
|---|---|
| GREG ESTES AND JEFF ESTES, CO-EXECUTORS OF THE ESTATE OF JOE HOWARD ESTES, DECEASED | APPELLANTS |
| v. | |
| SARAH YOUNG ESTES | APPELLEE |

| | |
|---|---|
| DATE OF JUDGMENT: | 09/25/2014 |
| TRIAL JUDGE: | HON. C. MICHAEL MALSKI |
| COURT FROM WHICH APPEALED: | LEE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | T.K. MOFFETT |
| ATTORNEY FOR APPELLEE: | RHETT R. RUSSELL |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| TRIAL COURT DISPOSITION: | DETERMINED THAT APPELLEE HAD NOT CLEARLY ABANDONED THE MARRIAGE AND AWARDED APPELLEE A CHILD'S SHARE OF THE INHERITANCE |
| DISPOSITION: | REVERSED AND RENDERED - 04/19/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., ISHEE AND FAIR, JJ.**

**ISHEE, J., FOR THE COURT:**

¶1.    After a nine-month marriage between Sarah Young Estes (Young) and Joe Howard Estes (Estes), Estes passed away testate. His will did not provide for his wife to inherit from his estate. The record reflects that soon into the marriage, Estes experienced health difficulties, including the amputation of one leg and surgery to clear blocked neck arteries.

Shortly thereafter, Young permanently moved back into her own separate home and filed for divorce. After Estes died, Young contested his will since it contained no provision for her. Initially, the Lee County Chancery Court granted Young a widow's allowance and a child's share of the estate. However, on appeal, this Court reversed and rendered the widow's allowance and reversed and remanded the child's-share inheritance for further analysis as to whether Young had abandoned the marriage as a matter of law.[1] On remand, the chancery court determined that Young had not abandoned the marriage as a matter of law and again granted her a child's share of the inheritance. Aggrieved, Estes's family appealed. We find that Young had indeed abandoned the marriage. Therefore, we reverse and render the chancery court's judgment.

**STATEMENT OF FACTS**

¶2.	Young and Estes married on August 3, 2006, after dating for approximately six months. Young entered the marriage with four natural children and three grandchildren, whom she had adopted. The grandchildren were minors at the time. Estes entered the marriage with several grown children. After the marriage, Young's grandchildren, the youngest of whom was eight years old at the time of the marriage, continued to live in the home Young had lived in prior to the marriage and which she continued to maintain after the marriage.

¶3.	Young worked as a caregiver to the sick and elderly in their respective locations. She alternated one week of working night shifts followed by another week of working day shifts.

---

[1] *In re Estate of Estes*, 111 So. 3d 1223,1224-25 (¶¶1-2) (Miss. Ct. App. 2012).

Additionally, as mentioned above, Young maintained her separate home where her grandchildren resided. Hence, she divided her time between her work, her household where her grandchildren lived, and Estes's home. As noted by the chancellor, Estes and Young's "living arrangement was somewhat non-traditional."

¶4. Three days after Young and Estes married, Estes entered the hospital due to a previously sustained foot injury that would not heal. The injury quickly progressed and eventually led to the amputation of Estes's leg on August 17, 2006. Two months later, in October 2006, Estes returned to the hospital for surgery to unblock arteries in his neck.

¶5. The record reveals that Estes's brother, Tommy, as well as Tommy's wife, son, and daughter-in-law, provided primary care of Estes following his health complications. Meanwhile, the record is conflicting with regard to Young's participation in Estes's overall recovery. It is without question that Young's schedule between work and caring for her grandchildren prevented her from providing consistent care for Estes in his home. Estes's family also testified that Young's visits to Estes decreased substantially after he became sick and that she rarely came to see Estes except to drop off food on occasion. There is also testimony from numerous witnesses reflecting that after Estes's leg was amputated, Young asked Estes's family to determine how they were going to care for him because she would not and did not have the time to care for "a cripple."

¶6. Young, however, alleges that following Estes's illnesses she spent the night at his house and cooked him breakfast numerous times before her day shifts began at 7:00 a.m. These allegations are disputed by Tommy, who stopped by Estes's house twice a day every

3

day between 6:00 and 6:30 in the morning and again between 5:00 and 5:30 in the evenings, and only rarely saw Young present. One of Estes's sons, Jeff, corroborated Tommy's testimony and further testified that by November 2006, Young had stopped going to Estes's house altogether.

¶7. Young's December 2006 tax documents also indicate that she did not reside with Estes. She defined herself as a "head of household," asserting that she was a married person living apart from her spouse and providing a home for her children. She further listed her separate home as her primary home for her homestead exemption.

¶8. In November 2006, Young consulted with a doctor regarding Estes's mental state. On January 30, 2007, Young initiated involuntary-commitment proceedings against Estes. She stated that he exhibited rages and threatened to physically harm her. She also said he accused her of having an affair. Additionally, she complained that he sat in his wheelchair wearing nothing but underwear and shot at birds in the yard through an open window in the house.

¶9. Estes admitted that he shot at blackbirds feeding out of his squirrel feeders in the yard and that he shot at them through an open window because it was too hard for him to get in and out of his house.[2] Furthermore, Estes explained that he often did not wear pants at home because it felt uncomfortable on the leg where his amputation had occurred.

¶10. After a psychiatric evaluation, Estes was found to be competent with no indication of

---

[2] The closest neighbor in the direction Estes was shooting was ninety acres away, and the record does not reflect that anyone else had ever complained of his shooting at the blackbirds.

4

any psychiatric illness or anger-management problems. The evaluation also concluded that Estes was no danger to himself or anyone else. As such, Estes was released from psychiatric care.

¶11. Immediately thereafter, on February 2, 2007, he sought a restraining order against Young. Approximately one month later, on March 7, 2007, Young filed for divorce seeking half of all of Estes's assets, including the value of his land and his bank accounts. Young also requested temporary and permanent restraining orders against Estes. A few weeks later, Estes counterclaimed for divorce and also sought a restraining order. Eventually the parties entered into a mutual restraining order. In May 2007, Estes received notice of the final divorce hearing. The day after he received the notice, he shot and killed himself.

¶12. Estes's will did not allow for Young to inherit anything from his estate. Young contested the will. The trial court granted her a $12,000 widow's allowance as well as a one-fifth child's share of the estate in the amount of $68,927.63. At the time, her inheritance totaled $80,927.63.

¶13. Estes's family appealed the trial court's judgment. On appeal, this Court determined that Young was not entitled to a widow's allowance since she was living apart from Estes, through no fault of his own, and without support from him at the time of his death. *Estes*, 111 So. 3d at 1227 (¶14). There, we determined: "It is undisputed that Young left Estes's home by her own volition after his leg was amputated. And she was living in her own home at the time Estes died." *Id*. We reversed and rendered her award of a widow's allowance of $12,000.

¶14. We also remanded her award of a child's share of the estate. We determined that a reading of the chancellor's order showed that he had mistakenly believed that Mississippi law required him to provide Young with a child's share of the estate. *Id*. at 1228 (¶20). However, we ascertained that Mississippi law provides that a widow is not entitled to a child's share if there is "a clear desertion and abandonment" of the marriage. *Id.* at (¶19). Hence, we remanded the case for a determination as to whether Young had clearly deserted and abandoned the marriage. *Id*. at (¶20). We noted that the reason we did not render the child's-share award was because "the chancellor made *no* finding – let alone a finding of clear abandonment, as required by [Mississippi law] – making remand proper, so that the chancellor, as the fact-finder, may determine whether Young is estopped from claiming an inheritance . . . ." *Id*. at n.6.

¶15. On remand, with regard to desertion and abandonment, the chancellor stated the following:

> While facts exist which show a non-traditional marriage, [Estes] knew when the parties married that [Young] had, on a daily basis, the responsibilities of attending to her grandchildren. Moreover, [Estes's] behavior was at times bizarre and the [c]ourt cannot say that [Young] willfully left and had the intention of permanently separating from the marital relationship. Mere absence from the home, without more, does not show willfulness.
>
> The [c]ourt would note that [Young's] consultation with [a psychiatric doctor] on November 26, 2006, creates the inference that [Young] was trying to get [Estes] help. Moreover, seeking to have [Estes] committed, on January 30, 2007, rather than filing for divorce is suggestive to the [c]ourt that [Young] was trying to get [Estes] help and that the marriage was not over. Efforts by a spouse to get a spouse professional help should not be used against that spouse. Finally, the [c]ourt notes that [Estes] filed a [p]etition to restrain [Young] on February 2, 2007, which may well have caused [Young] to seek a divorce almost a month later.

¶16. Accordingly, the chancellor determined that Young had not clearly deserted and abandoned the marriage, thereby confirming her award of $68,927.63 as a child's share of the estate. Estes's family now appeals the chancery court's judgment.

**DISCUSSION**

¶17. An appellate court "will not disturb the findings of a chancellor when [the findings are] supported by substantial evidence unless the chancellor abused his discretion, [or the findings were] manifestly wrong, clearly erroneous[,] or [based on the application of an] erroneous legal standard." *Long Meadow Homeowners' Ass'n v. Harland*, 89 So. 3d 573, 577 (¶11) (Miss. 2012) (citation omitted). Questions of law are reviewed de novo. *Id*.

¶18. When determining whether a spouse clearly deserted and abandoned a marriage, Mississippi caselaw provides a spectrum of factual scenarios for comparison. Most notably, *Tillman v. Williams*, 403 So. 2d 880 (Miss. 1981), serves as a benchmark case providing guidelines for determining abandonment. In *Tillman*, Narvel Tillman challenged the will of his wife, Ada Broadnex Tillman, after her death, and petitioned the trial court to recognize him as an heir to the estate. *Id*. at 880. The Tillmans were married for approximately twenty-nine years at the time of Ada's death, but had been separated for approximately fifteen or twenty years. *Id*. Neither party had made any attempt to divorce the other or remarry. *Id*. Specifically, "[t]here was no evidence of any attempted remarriage or disclaimer of the marriage by either party during the years of separation. There was no evidence that either party attempted to secure a divorce." *Id*. Ultimately, the Mississippi Supreme Court stated: "A thorough review of the record reveals that not only was an

7

abandonment uncertain, . . . [t]here was, at most, just a separation proven. As stated, there [were] no marriage or divorce proceedings by either party . . . ." *Id*. at 882.

¶19. In sum, to prove desertion or abandonment in cases such as this, a clear indication that one party is no longer committed to a marriage is necessary. While we recognize that separation alone is not proof enough that a marriage has been abandoned, Mississippi courts have recognized qualifying indicators to include filing for divorce, filing for remarriage, and evidence of bigamy. *See id.*; *Rowell v. Rowell*, 170 So. 2d 267, 271-72 (Miss. 1964).

¶20. Here, it is undisputed that Young filed the first petition for divorce between the parties in March 2007. The chancery court cited the possibility that Estes's petition for a restraining order against Young may have incited Young to file for divorce. The chancery court further stated that it could not determine that Young "willfully left and had the intention of permanently separating from the marital relationship. Mere absence from the home, without more, does not show willfulness."

¶21. We find the chancery court's conclusions to be in conflict with the evidence. A summary of the undisputed chronological series of pertinent events during the parties' nine-month marriage consists of the following: (1) Estes becomes ill; (2) Young slowly reduces the amount of time spent with Estes; (3) Young attempts to involuntarily commit Estes; (4) Estes seeks a restraining order against Young upon his release from the commitment proceedings; (5) Young files for divorce and restraining orders; (6) Estes counterfiles for divorce; and, (7) Estes takes his own life after receipt of notice for a final hearing on the divorce proceedings. Regardless of any other factors present in this case, the most glaring

8

evidence of Young's abandonment of the marriage was her petition for divorce. Again, the supreme court has clearly noted that filing for divorce serves as an indicator that a party intends to leave the relationship. Furthermore, nothing in the record following Young's petition for divorce signals that the parties reconciled in any manner. Conversely, it would appear that the parties remained estranged and set on divorcing from one another.

¶22. As such, we find that the chancery court abused its discretion in determining that Young did not desert and abandon her marriage to Estes. In doing so, we reverse and render the chancery court's award to Young of a child's share of Estes's estate.

¶23. **THE JUDGMENT OF THE LEE COUNTY CHANCERY COURT IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, FAIR, JAMES, WILSON AND GREENLEE, JJ., CONCUR. CARLTON, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**

9