# IN THE SUPREME COURT OF MISSISSIPPI

## No. 2014-CT-01533-SCT

## CONSOLIDATED WITH

## No. 2011-CT-01451-SCT

*GREG ESTES AND JEFF ESTES, CO-EXECUTORS OF
THE ESTATE OF JOE HOWARD ESTES, DECEASED*

*v.*

*SARAH YOUNG ESTES*

## ON WRIT OF CERTIORARI

DATE OF JUDGMENT: 09/25/2014
TRIAL JUDGE: C. MICHAEL MALSKI
COURT FROM WHICH APPEALED: LEE COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANTS: AMY K. PIETROWSKI
ATTORNEY FOR APPELLEE: RHETT R. RUSSELL
NATURE OF THE CASE: WILLS, TRUSTS, AND ESTATES
DISPOSITION: THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE LEE COUNTY CHANCERY COURT IS AFFIRMED AND THE CASE IS REMANDED - 06/01/2017
MOTION FOR REHEARING FILED:
MANDATE ISSUED:


**EN BANC.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.　Sarah Young Estes (Young) seeks review of the Court of Appeals' decision to reverse

and render the trial court's judgment entitling her to a child's share of the estate of her late

husband, Joe Estes.[1] A divided Court of Appeals reversed and rendered the trial court judgment, finding persuasive evidence of Young's abandonment, principally from the filing of a divorce against Estes. *Estes v. Estes* (*Estes II*), 2016 WL 1564404 (Miss. Ct. App. Apr. 19, 2016). This Court granted certiorari. Finding that the chancellor did not manifestly err when he determined that Young had not abandoned the marital relationship and was entitled to a child's share of Estes's estate, we reverse the judgment of the Court of Appeals, affirm the judgment of the Lee County Chancery Court, and remand for further proceedings.

### FACTS AND PROCEDURAL HISTORY

¶2.     After dating for approximately six months, Young and Estes married on August 3, 2006. Young entered the marriage with four natural children and three adopted minor grandchildren. Estes also entered the marriage with several grown children. After marrying Estes, Young continued to maintain a home with her grandchildren where she had lived prior to the marriage. Young worked as a caregiver to the sick and elderly in their respective locations. She alternated one week of working night shifts followed by another week of working day shifts. As noted by the chancellor, Estes's and Young's "living arrangement was somewhat non-traditional." Despite this, the record shows that Young split her time between her children and Estes. She testified that she slept at his house when she was not working nights and prepared at least one meal a day for Estes.

---

[1]For purposes of this opinion, Joe Estes; the Estate of Joe Howard Estes; and the beneficiaries and co-executors of the Estate of Joe Howard Estes, Greg Estes and Jeff Estes, will be referred  collectively to as "Estes."

2

¶3.    On August 6, 2006, three days after Young and Estes married, Joe Estes was hospitalized for a foot injury that eventually resulted in the amputation of his left leg above the knee on August 17, 2006. Two months later, in October 2006, Estes returned to the hospital for surgery to clear blocked arteries in his neck.  Young testified that, following these medical procedures, despite providing care for her husband, Estes's behavior changed. She testified that he would lash out at her, even threatening to kill her. In November 2006, Young consulted with a doctor regarding Estes's mental state. Following the doctor's advice, she reported the incident to the sheriff's department. In mid-January, after another episode in which Estes accused Young of adultery, Young decided to separate from Estes.

¶4.    Estes's family members tell a different story. Following the amputation, Estes's family members testified that they, unlike Young, were very supportive of Estes. Estes's brother testified that he visited his brother every morning and every evening, spending about half an hour with Estes, and he rarely would see Young there. Jeff, one of Estes's sons, testified that he spent most weekends with his father and also stated that he rarely saw Young there during those times. In addition to finding Young absent, several family members testified that Young was stealing groceries to feed her own children. Estes's son also testified that his father had told him that Young had tried to strike him on his neck where he had recently had surgery. He also testified that his father had told him that he believed that Young was adding dish soap to his coffee.

¶5.    On January 30, 2007, after Estes had refused to seek medical or mental help, Young initiated involuntary-commitment proceedings against Estes. She stated that he exhibited

rages and threatened to harm her physically. She also said he accused her of having an affair and stealing groceries. After his psychiatric evaluation, Estes was found to be competent, with no indication of any psychiatric illness or anger-management problems. The evaluation also concluded that Estes was no danger to himself or anyone else. Thus, Estes was released from psychiatric care.

¶6.     Immediately thereafter, on February 2, 2007, Estes sought a restraining order against Young. Approximately one month later, on March 7, 2007, Young filed for divorce, seeking half of all of Estes's assets, including the value of his land and his bank accounts. Young testified that her sole purpose in initiating the divorce proceedings was so, with a court order, she could return to Estes's property and gather her belongings. Young also requested temporary and permanent restraining orders against Estes. A few weeks later, Estes counterclaimed for divorce and also sought a restraining order. Eventually the parties entered into a mutual restraining order. In May 2007, Estes received notice of the final divorce hearing. The next day he shot and killed himself.

¶7.     Estes's will did not provide for Young to inherit anything from his estate. Young renounced the will. The trial court granted Young a $12,000 widow's allowance as well as a one-fifth, child's share of the estate in the amount of $68,927.63. Estes's two sons, acting as co-executors, appealed the trial court's judgment. On appeal, the Court of Appeals determined that Young was not entitled to a widow's allowance since she was living apart from Estes, through no fault of his own, and without support from him at the time of his death. *In re Estate of Estes* (*Estes I*), 111 So. 3d 1223, 1227 (Miss. Ct. App. 2012). The

Court of Appeals remanded the case for a determination of whether Young's actions constituted a clear abandonment of the marriage, thus estopping her from inheriting from Estes's estate. *Id.* at 1228 (citing *Tillman v. Williams*, 403 So. 2d 880 (Miss. 1981)).

¶8. On remand, the chancellor again found that Young had not clearly abandoned the marriage and confirmed her award of a child's share.

¶9. Estes again appealed the chancery court's judgment. The Court of Appeals found that the chancellor's determination was "in conflict" with the evidence and, as such, the chancellor had erred in not finding that Young had deserted and abandoned her marriage to Estes. *Estes v. Estes* (*Estes II*), 2016 WL 1564404 (Miss. Ct. App. Apr. 19, 2016). We granted certiorari to review this determination.

## DISCUSSION[2]

**Whether the trial court erred in determining that Young had not abandoned her marriage to Estes and awarding her a child's share of Estes's estate**.

¶10. The standard of review on "findings of fact by a trial judge without a jury [is] manifest error, including whether the findings were the product of prejudice, bias, or fraud, or manifestly against the weight of the credible evidence." *Hale v. State Democratic Exec. Comm.*, 168 So. 3d 946, 951 (Miss. 2015) (quoting *Young v. Stevens*, 968 So. 2d 1260, 1263

[2]In her petition for certiorari, Young raised the issue of whether Estes's failure to plead the affirmative defense of estoppel procedurally barred Estes from appealing the desertion and abandonment issue. However, Young did not seek certiorari following the *Estes I* Court of Appeals decision to remand on this issue, and further, the chancellor decided the issue on the merits in the second trial without objection from Young. Therefore, Young's assertion that the issue of estoppel is waived because Estes failed to assert it in his pleadings will not be considered.

5

(Miss. 2007)). This standard of review precludes the "scouring [of] every record before the Court for any and all information which might contradict a . . . court's factual finding" since this would "amount to an inspection for errors that are far less conspicuous than those that are 'unmistakable, clear, plain, or indisputable.'"*Id.* (quoting Black's Law Dictionary 963 (6th ed. 1990)).

¶11.    The Court of Appeals in *Estes I* directed the chancellor, on remand, to consider the "clear-abandonment standard" of *Tillman v. Williams*, 403 So. 2d 880 (Miss. 1981). Following the trial, the chancellor addressed the issue of clear desertion, finding that Estes had failed to meet the burden of proof. The following was included in the chancellor's factual findings and judgment:

> Critical to a determination of Sarah's clear desertion and abandonment of the marriage and resultant estoppel from claiming a statutory right to an inheritance are the facts following Joe's October hospitalization. According to Sarah, after Joe was discharged from the hospital, he began to act irrationally. He accused her of infidelity and the theft of groceries. On November 26, 2006, Sarah called Joe's physician, Dr. Pinson, to seek advice on how to help Joe. Sarah then filed a complaint with the Lee County Sheriff's Department that Joe was threatening her and acting irrationally. A deputy sheriff came to Joe's residence and made a report. Joe's irrational behavior is born [sic] out by his refusal to dress appropriately and by him discharging a gun from inside his house through an open window. The severity of Joe's mental difficulties is perhaps best documented, however, by his tragic May 18, 2007 suicide.
> Regardless of the date of separation, the chronology of events following the parties' separation is not disputed. On January 30, 2007, Sarah files a commitment proceeding against Joe. She attaches a copy of the previously mentioned Sheriff's report. The two examining physicians fail to find Joe a danger to himself or other[s], i.e., not in need of involuntary commitment.
> On February 2, 2007, Joe seeks a restraining order against Sarah. Sarah counters on March 7, 2007, by filing for divorce. Joe answers and files a Counter-Complaint on March 27, 2007. On March 26, 2007, the parties agree

6

to a mutual restraining order. On March 29, 2007, a temporary order is entered directing Joe to allow Sarah to retrieve her personal property.

Guided by the applicable law and applying that law to the facts and having observed the witnesses, the Court is of the opinion that those urging an estoppel have failed to prove that estoppel.

While the facts exist which show a non-traditional marriage, Joe knew when the parties married that Sarah had, on a daily basis, the responsibilities of attending to her grandchildren. Moreover, Joe's behavior was at times bizarre and the Court cannot say that Sarah willfully left and had the intention of permanently separating from the marital relationship. Mere absence from home, without more, does not show willfulness.

The court would note that Sarah's consultation with Dr. Pinson on November 26, 2006, creates an inference that Sarah was trying to get Joe help. Moreover, seeking to have Joe committed, on January 30, 2007, rather than filing for divorce is suggestive to the Court that Sarah was trying to get Joe help and that the marriage was not over. Efforts by a spouse to get a spouse professional help should not be used against that spouse. Finally, the Court notes that Joe filed a Petition to restrain Sarah on February 2, 2007, which may well have caused Sarah to seek a divorce almost a month later. (Citations omitted).

¶12.    The Court of Appeals listed the following facts it found in "conflict" with the chancellor's findings:

(1) Estes becomes ill; (2) Young slowly reduces the amount of time spent with Estes; (3) Young attempts to involuntarily commit Estes; (4) Estes seeks a restraining order against Young upon release from the commitment proceedings; (5) Young files for divorce and restraining orders; (6) Estes counterfiles for divorce; and, (7) Estes takes his own life after receipt of notice for a final hearing on the divorce proceedings.

*Estes v. Estes* (*Estes II*), 2016 WL 1564404, *4 (Miss. Ct. App. Apr. 19, 2016). The Court of Appeals then stated the "most glaring evidence of Young's abandonment of the marriage was her petition for divorce," citing *Tillman* as primary legal support. *Id.*

¶13.    However, the *Tillman* case actually used the language "*secure a divorce*." *Tillman*, 403 So. 2d at 881. In *Tillman*, this Court reversed the trial court's judgment, finding that "[a] thorough review of the record reveals that not only was an abandonment uncertain, but there

7

just was not any substantial evidence to show a desertion or abandonment." ***Tillman***, 403 So. 2d at 882. In fact, ***Tillman*** holds that the requirement for clear proof of abandonment must be strictly construed:

> Our Legislature has not seen fit to enact any legislation on this abandonment question. It is, therefore, obvious that the statute has to be strictly construed unless there is a clear desertion and abandonment that sets up the estoppel. In ***Walker***, the surviving wife had engaged in a marriage ceremony with another man, and her deceased husband also had married another. There was a clear abandonment of the marriage relationship.

***Id.*** (citing ***Walker v. Matthews***, 191 Miss. 489, 3 So. 2d 820 (1941)).

¶14.    In ***Rowell v. Rowell***, the Court also focused on the legal status change and determined that the trial court had erred when it had found that the widow's adulterous relationship was grounds to show abandonment or desertion.  ***Rowell v. Rowell***, 251 Miss. 472, 170 So. 2d 267, 271-72 (1964). Relying on an Alabama case, the Court stated, "[a]s long as the marriage relation continued in law, the rights of the wife continued under the [descent and distribution] statute." ***Id.*** at 270 (citing ***Nolan v. Doss***, 133 Ala. 259, 261-62, 31 So. 969, 969-70 (1902)). The ***Rowell*** Court found that an adulterous relationship was not sufficient evidence of abandonment or desertion and that no evidence was presented that showed a bigamous marriage, which may have been grounds for abandonment. ***Id.*** at 271. The Court again focused on the legal change that occurs when someone remarries. ***Williams v. Johnson***, 148 Miss. 634, 114 So. 733 (1927) (finding that the adulterous conduct was not at issue but only whether a bigamous marriage resulted).

¶15.    Following the renunciation of a will that fails to include the spouse, the will proponent may raise abandonment and desertion as estoppel to the renunciation.  ***Rowell***, 251 Miss.  at

477-78, 170 So. 2d at 268. Mississippi Code Section 91-5-25 allows the surviving spouse automatically to renounce the will, thus the burden to show evidence of clear abandonment or desertion is on the aggrieved party. Miss. Code Ann. § 91-5-25 (Rev. 2013).

¶16. As this case is close factually and there was no legal change of marital status, we cannot say the chancellor was manifestly wrong in granting Sarah Young a child's share of Joe Estes's estate.

## CONCLUSION

¶17. We reverse the judgment of the Court of Appeals, affirm the judgment of the Lee County Chancery Court, and remand for further proceedings.

¶18. **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE LEE COUNTY CHANCERY COURT IS AFFIRMED AND THE CASE IS REMANDED.**

**DICKINSON AND RANDOLPH, P.JJ., KITCHENS, KING, COLEMAN, BEAM AND CHAMBERLIN, JJ., CONCUR. MAXWELL, J., NOT PARTICIPATING.**